## NEW YORK SUPERIOR COURT.

THE PEOPLE OF THE STATE OF NEW YORK agt. OTTO HOYM and EDWARD HAYMAN.

The act of April 17, 1860, prohibiting certain exhibitions and plays within the city and county of New York, on *Sunday*, *held to be constitutional* and valid, as a lawful exercise of legislative authority.

Consequently, the defendants, by exhibiting on Sunday, a play called "One of our People," or the "Brave Isaac," in the building Nos. 37 and 39 Bowery, known as the "New York Stadt Theatre," incurred the penalty prescribed by this act, to wit: guilty of a misdemeanor, and in addition to the punishment therefor provided by law, subjected to a penalty of $500, with a forfeiture of license.

*New York Special Term, December*, 1860.

THIS is a general demurrer to the complaint, that it does not state facts sufficient to constitute a cause of action.

The complaint states that the defendants, on Sunday,

the 20th of May, 1860, did exhibit to the public, and aided, by advertisement and otherwise, in exhibiting to the public, in the building and room situated at numbers 37 and 39 Bowery, within the city of New York, and known as the New York " Stadt Theatre," a play called " One of our People," or the " Brave Isaac," and certain parts therein, and certain other dramatic performances ; whereby the defendants had become subject to a penalty of $500, according to the provision of the statute after mentioned, and are indebted to the society for the Reformation of Juvenile Delinquents, in the city of New York, to the amount of the said sum of $500, whereby an action has accrued according to the provisions of an act entitled " an act to preserve the public peace and order on the first day of the week, commonly called Sunday," passed April 17th, 1860, and of the first and second sections of the said act. That the Society for the Reformation of Juvenile Delinquents in the city of New York, in the name of the plaintiffs, the people of the state, sue for the said penalty, for the use of the said society, according to the provisions of the statute.

Another cause of action for a similar exhibition on the 27th of May, 1860, is then set forth ; and judgment is demanded against the defendants for the sum of $1,000, with costs.

To this complaint there is the general demurrer as before stated.

HENRY A. CRAM, *for plaintiffs.*
HENRY L. CLINTON, *for defendants.*

HOFFMAN, Justice. The statute referred to is entitled " an act to preserve the public peace and order on the first day of the week, commonly called sunday," passed 17th of April, 1860, to take effect immediately.

It provides, that it shall not be lawful to exhibit on the first day in the week, commonly called sunday, to the pub-

lic, in any building, garden, grounds, concert-room, or other room, or other place within the city and county of New York, any interlude, tragedy, comedy, opera, ballet, play, farce, negro minstrelsy, negro, or any dancing, or any other entertainment of the stage, or any part or parts therein, or any equestrian circus, or dramatic perform- ance, or any performance in jugglery, acrobat, or rope dancing.

By the second section, " any person offending against the provisions of this law, and every person aiding in such ex- hibitions, by advertisement or otherwise, and every owner or lessee of building, room, &c., who shall lease or let out the same, for the purpose of such exhibition, shall be guilty of a misdemeanor, and in addition to the punishment there- for provided by law, shall be subjected to a penalty of five hundred dollars, in favor of the Society for the Reformation of Juvenile Delinquents, to be sued for in the name of the people; in addition to which, every such exhibition or per- formance shall of itself, forfeit, vacate, and annul, any license which may have been previously obtained by any manager, proprietor, owner or lessee, consenting to, causing or allowing, or letting any part of a building, for the pur- pose of any such exhibition and performance."

The learned counsel of the plaintiffs has entered largely into the question of the origin and sanction of the christian sabbath. It may not be essential, but it is far from being irrelevant, to the decision of the present case, to sustain the divine authority of its institution. This would throw light upon the nature of legislative provisions, and furnish a guide to a rigorous or expanded rule of construction.

In *Campbell* agt. *The International Insurance Company*, (4 *Bosworth's Rep.*, 312,) I have expressed my own views upon that subject. I repeat them in language far better than my own. " The dedication of one day in the seven, to religious rest and the worship of Almighty God, is of divine authority and perpetual obligation, as a character-

istic of revealed religion during all its successive periods; having been enjoined upon men at the creation; recognized and confirmed in the most solemn manner in the ten commandments; vindicated by our divine Lord from unauthorized additions and impositions of the Jewish teachers—and transferred, upon the abrogation of the ceremonies of the Mosaic law, to the first day of the week, in commemoration of the resurrection of Christ, and on that account called the Lord's day." (*Rev. D. Wilson, Bishop of Calcutta.*)

It would be inappropriate here to discuss this subject at length. It is enough to say, that this conclusion has not been lightly formed, nor without attention to the arguments of the eminent men who have doubted or contested it.

But the history of the legislation of our state, connected with the Lord's day, is of great importance and pertinence.

The earliest document I know of, implying a recognition of christianity, is the " Conditions of the Burgomasters of Amsterdam of 1656." That city was to send to the place to be established by the colonists, a proper person for a schoolmaster, " who shall also read the Holy Scriptures in public, and set the Psalms." (*Collection Historical Soc. N. Y., vol.* I, *p.* 222.)

By the Duke of York's laws of April, 1664, it was declared—" Whereas, the public worship of Almighty God is much discredited for want of faithful and able ministers to instruct the people in the true religion, and for want of convenient places capable of receiving any number of persons in a decent manner for celebrating God's holy ordinances, these ensuing laws are to be observed in every parish." Then follow various laws. The fifth article enjoins that every minister of every parish shall preach constantly every sunday; that every person affronting or disturbing any congregation on the Lord's day, shall be punished; and, by the ninth article, sundays are not to be profaned by travellers, laborers, or vicious persons.

By the charter of liberties, of October, 1683, it was

provided, " that no person or persons who profess faith in God by Jesus Christ, shall at any time be any ways molested, punished, disquieted, or called in question, for any difference of opinion in matter of religious concernment, who do not actually disturb the civil peace of the province; but that all and every such person or persons may at all times freely have and freely enjoy his or their judgments or consciences in matters of religion throughout all the province; they behaving themselves peaceably and quietly, and not using their liberty to licentiousness, nor to the evil, injury, or disturbance of others."

On the 13th of May, 1691, an act was passed declaring what are the rights and privileges of their Majestys' subjects inhabiting within the province of New York. Its provisions were similar to those of the charter of 1683.

On the 22d of October, 1695, an act was passed, entitled, " An act against the profanation of the Lord's day, called sunday." The recital is as follows:—

" Whereas, the true and sincere worship of God, according to His will and commandments, is often profaned and neglected by many of the inhabitants and sojourners within this province, who do not keep holy the Lord's day, but in a disorderly manner accustom themselves to travel, labor, walking, shooting, fishing, playing, horse-racing, frequenting of tippling-houses, and the using many other unlawful exercises and pastimes upon the Lord's day, to the great scandal of the holy christian faith." The act then proceeds to prohibit all such, enumerating them again, under a certain penalty.

There were certain exceptions; among which were all free Indians within the province not professing the christian faith.

This act is found in *Livingston and Smith's edition of the Colonial laws*, (*vol.* 1, *p.* 23,) and in *Van Schaack's edition of laws down to* 1773, *p.* 24. It was in force on the 9th of April, 1775, and hence, at the adoption of the constitution

of 1777, was one of the laws recognized to continue as the law of the state, subject to legislative alteration; and it remained in force until the act of the 23d of February, 1788, (2 *Greenleaf*, 89,) when the first state statute was passed, the provisions of which have been substantially adopted in the revisions of our statutes in 1813 and 1830, with some additions. (2 *R. L.*, 1813, *p.* 193; 1 *R. S.*, 1830, *p.* 676.)

By the constitution of 1777, it was declared, that the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed within the state to all mankind; provided that the liberty of conscience hereby granted shall not be construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.

It is of importance here to notice, that the constitution of 1777 does not contain the provision of the subsequent constitutions of 1822 and 1846, that no person shall be deprived of life, liberty or property, without due process of law; or no member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers.

But the thirty-fifth article declares that such parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legislature of the colony, as did together form the law of the colony on the 19th of April, 1775, should be and continue the law of the state.

The charter of rights and liberties of 1683, comprehends the provisions of the constitutions above referred to. The bill of rights of May, 1691, contained the same.

Now conceding that the former was not in force in 1775, (*Jackson* agt. *Gilchrist*, 15 *Johns. Rep.*, 112; *Hoffman's Ch. Pr.*, vol. 1, *p.* 15. Court of Appeals. New York Reports.)

and that the latter was effectually repealed by King William in 1697, (*Livingston and Smith's ed. laws, vol.* 1 ; *Bradford's do., vol.* 1, *p.* 1–4,) yet we have the great charter of John, and that of the ninth of Henry III., confirmed in thirty-two consecutive acts, as undeniably in force. No lawyer would deny that these were as clearly part of the law of England, brought by the colonists to this land as a portion of their heritage, as the right to the writ of habeas corpus itself. (*Kent's Comm., vol.* 2, *p.* 1—26.)

The declarations of the representatives of the people in 1683, and in 1691, recognized and announced the provisions of the great charters, to the newly opened world of freedom ; and if these declarations were effaced from the statute book, there yet remained the ineffaceable, indestructible rights of Englishmen, proclaimed in these charters, and transmitted from the year 1215, through every age and in every clime, where Englishmen have built up a community.

But soon after the revolution a bill of rights was adopted. It was passed January 26, 1787. (1 *Greenleaf*, 289, 1 *R. L. of* 1813, *p.* 1.) In this the provisions of the charters of John and Henry were declared in nearly the identical language. And the revisors of 1830, after adverting to the transfer of these leading provisions into the constitution of 1822, yet reported, and the legislature adopted, an act " of the rights of the citizens and inhabitants of this state." (1 *R. S.*, 1830, 92 ; *Revisors' Notes, vol.* 3.)

One further fact should be noticed. The clause as to the freedom of religious profession contained in section 3 of the constitution of 1846, was in the constitution of 1777, (article 38,) and in that of 1822, (article 7, § 3.) The only change is the additional clause, that no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief.

This historical investigation establishes, as I think, beyond doubt, that there has never been a period within our legislative history, since 1777, at least, when every pro-

vision as to the enjoyment and right to property, and as to the freedom in religious profession now found in the constitution of 1846, was not as fully part of the fundamental law of this state, as it is now. The exception as to witnesses does not affect the present question.

And thus if the legislature cannot prohibit, restrict, and modify the right of using property on Sunday, under the present constitution—then the statute of the 23d of February, 1788, and its renewal in 1813, and 1830, have been equally illegal and void. The selling of merchandise on that day has been forbidden in these statutes. The whole course of legislation has then been against the organic law; and the decisions of courts of justice have been violations of the citizens' rights.

I cannot see a substantial distinction between the introduction of the employment of cattle in ordinary agricultural labor, or the selling of merchandise in a person's ordinary business, and the prohibition of the use of premises for certain specified purposes, on the sunday. The restriction in each instance rests upon the principle of the preservation of good order, and the public morality and peace. In each the full enjoyment of property is restrained. In the old statutes no distinction is found between cases of property possessed at the passing of the statute, and that subsequently acquired; nor is there a trace of it in the authorities.

The case of *Wynehammer* agt. *The People*, (3 *Kernan*, 378,) is much relied upon by the counsel for the defendants. It was there held that the prohibitory act, in its operation upon liquors existing in the hands of a person when it took effect, was taking property without due process of law, and was unconstitutional; that the legislature might pass such a prohibitory act, plainly and distinctly prospective as to the property on which it was to operate; and that as the statute in question had not discriminated between the liquors owned at the time, or acquired afterwards, it could not be sustained at all.

People agt. Hoym.

But throughout the case—in every one of the leading opinions delivered—the great distinction is noticed and enforced, between legislative acts which operate to the entire destruction of the property, or any right to use it, and restrictions or qualifications upon the time, place, or mode of enjoyment.

"When provisions pass the boundaries of regulation and police, and work the essential loss or destruction of the property, they are unconstitutional. Between destruction and regulation there is somewhere, however difficult to define with precision, a true separation." (COMSTOCK, *J.*, *p.* 399.)

And this view answers every argument deduced from the constitution of the United States as to the inviolability of contracts. If the act can be sustained as a regulation, founded in public policy, of the use of property existing, or future, there is no contract between any one which is illegally affected.

The same consideration furnishes a reply to the suggestion that the act is void in being confined to the city of New York.

If the evil was local in the judgment of the legislature, the remedy may be local also.

The subject has received attention in some late cases in other states.

In *Ex parte Newman*, (cited in the nineteenth volume of the United States Digest, as reported in 9 *California Reports*, *p.* 502,) the decision is stated to have been as follows :—

The act of April, 1858, "for the better accommodation and observation of the sabbath," is unconstitutional and void, as a violation of religious freedom by enforcing the compulsory observance of a day held sacred by believers in one religion, and thus discriminating in its favor. (FIELD, *Justice, dissenting.*)

I have not been able to find the volume in New York.

In *Morgan* agt. *The Commonwealth*, (2 *Metcalf's Kentucky Reports*, 3,) the city council of Lexington was empowered by its charter to pass ordinances for the government of the city, not repugnant to the constitution of the state, and of the United States. An ordinance was passed, that no tavern-keeper, or other person, shall sell spirituous liquors on Sunday, or after eleven o'clock at night. A fine of $50 was imposed.

The defendant was a tavern-keeper duly licensed by the city council, and had paid the tax and given the bond required by law. The time when he got his license did not appear, nor that the ordinance was passed after the license. The questions which might arise on such a state of the case, did not present themselves here. As the defendant was apprised of the ordinances at the time he took his license, he was not deprived of any right which he believed he was entitled to.

Rights may exist of which the owner cannot be deprived, but still their exercise and enjoyment may be restrained and regulated by law,—so far as the public interest may render proper. The rights must be exercised in such a manner as not to affect prejudicially the tranquillity or morality of the local public.

The legislative power, therefore, working upon all future cases, was perfectly clear.

In *The Commonwealth* agt. *Nesbitt*, (34 *Penn. Rep.*, 398, 10 *Casey*,) the legislation of Pennsylvania is reviewed, commencing with an act of 1682, forbidding people from carrying on worldly business on sunday. The English statute (29 Ch. 2, 1676,) had served as a model for their own.

The court observes: "We are not forgetting that the public acts of our state abound in declarations in favor of liberty of conscience, and that some regard these declarations as inconsistent with the sunday laws. By our sunday laws, and our other laws against vice and immorality, we do not mean to enforce religion—we admit that to be impossible.

But we do mean to protect our customs, no matter that they may have originated in our religion, for they are essential parts of our social life."

The statute forbids every " worldly employment or business whatever." Its meaning was discussed at much length. The case was of a servant driving his employer to church on sunday, which was held not to be within the act.

In *The Commonwealth* agt. *Naylor*, (34 *Penn. Rep.*, 86,) the act of 1794 forbidding any worldly employment, with certain exceptions, on sunday, was discussed, and the case of *Smith* agt. *The Commonwealth*, (9 *Harris*, 426,) was referred to and approved. There it was held that a licensed inn-keeper could not sell liquor on sunday; it was a wordly business within the prohibition.

These views and authorities lead me to the conclusion that the statute in question is valid, and a lawful exercise of legislative authority.

The demurrer must be overruled with liberty to answer in twenty days, on payment of costs.