TYSON AND BROTHER — UNITED THEATRE TICKET OFFICES, INCORPORATED, *v.* BANTON, DISTRICT ATTORNEY, ET AL.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

No. 261. Argued October 6, 7, 1926.—Decided February 28, 1927.

1. Sections 167 and 172, c. 590, N. Y. Ls. 1922, the former declaring that the price of or charge for admission to theatres, places of amusement or entertainment, or other places where public exhibitions, games, contests or performances are held, is a matter affected with a public interest, and the latter forbidding the resale of any ticket or other evidence of the right of entry to any theatre, etc., at a price in excess of fifty cents in advance of the price printed on the face of such ticket or other evidence of the right of entry, contravene the Fourteenth Amendment. Pp. 429, 445.

2. The validity of the declaration (§ 167) that the price of admission is a matter " affected with a public interest," is in this case necessarily involved in determining the question directly

presented, viz., the validity of the price restriction on resales of tickets. P. 429.

3. The right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself, and, as such, within the protection of the Due Process of Law clauses of the Fifth and Fourteenth Amendments. P. 429.

4. The power to regulate property, services or business can be invoked only under special circumstances; and it does not follow that because the power may exist to regulate in some particulars it exists to regulate in others or in all. P. 430.

5. The authority to regulate the conduct of a business or to require a license, comes from a branch of the police power which may be quite distinct from the power to fix prices. P. 430.

6. The power to fix prices does not exist in respect of merely private property or business, but exists only where the business or the property involved has become affected with a public interest." P. 430.

7. A business is not affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance. Nor is the interest meant such as arises from the mere fact that the public derives benefit, accommodation, ease or enjoyment from the existence or operation of the business; and while the word has not always been limited narrowly as strictly denoting " a right," that synonym more nearly than any other expresses the sense in which it is to be understood. P. 430.

8. Characterizations of businesses as "*quasi* public, not strictly private," and the like, while well enough as a basis for upholding police regulations in respect of the conduct of particular businesses, cannot be accepted as equivalents for the description " affected with a public interest," as that phrase is used in the decisions of this Court as the basis for legislative regulation of prices. P. 430.

9. A declaration of the legislature that a business is affected with a public interest is not conclusive upon the judiciary in determining the validity of a regulation fixing prices in the business. P. 431.

10. The language of an opinion (*Munn* v. *Illinois,* 94 U. S. 113, 126), must be limited to the case under consideration. P. 433.

11. A business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been devoted to a public use and its use thereby, in effect, granted to the public. P. 434.

12. Each of the decisions of this Court upholding governmental price regulation, aside from cases involving legislation to tide over temporary emergencies, has turned upon the existence of conditions, peculiar to the business under consideration, which bore such a substantial and definite relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use. P. 438.

13. A theatre, though a license may be required, is a private enterprise; the license is not a franchise putting the proprietor under a duty to furnish entertainment to the public and admit all who apply. P. 439.

14. The contention that, historically considered, places of entertainment may be regarded as so affected with a public interest as to justify legislative regulation of their charges, is rejected. P. 441.

15. A statutory provision fixing the prices at which theatre tickets may be resold can not be sustained as a measure for preventing fraud, extortion, and collusive arrangements between theatre managers and ticket brokers. P. 442.

16. Constitutional principles, applied as they are written, must be assumed to operate justly and wisely as a general thing, and they may not be remolded by lawmakers or judges to save exceptional cases of inconvenience, hardship, or injustice. P. 445.

Reversed.

APPEAL from a decree of the District Court denying a temporary injunction in a suit brought by the appellant, a licensed ticket-broker corporation in New York, to restrain the District Attorney of New York County and the State Comptroller from forfeiting the license, forfeiting the bond accompanying the same, and prosecuting criminal proceedings, under the state law, because of the appellant's failure to conform to a provision thereof limiting the prices at which it may resell tickets, which it challenges as invalid under the Fourteenth Amendment.

*Mr. Louis Marshall,* with whom *Mr. James Marshall* was on the brief, for appellant.

The business of a ticket broker is lawful and cannot be prohibited. Theatre tickets are property in the constitutional sense. *People ex rel. Tyroler* v. *Warden of*

*City Prison,* 157 N. Y. 116; *People ex rel. Fleischmann v. Caldwell,* 64 App. Div. 46; aff'd 168 N. Y. 671; *People v. Marks,* 64 Misc. Rep. 679; *Collister* v. *Hayman,* 183 N. Y. 250; *Matter of Newman,* 109 Misc. Rep. 622; *People* v. *Weller,* 237 N. Y. 320.

It is unreasonable to suggest that the price of theatre tickets is "affected with a public interest" when this is not true of the prices of necessaries of life and wages. The limitations on the power of the Legislature to fix the price of commodities or of services, or to limit the right to contract with regard to them, were stated in *People* v. *Budd,* 117 N. Y. 15, aff'd *sub nom. Budd* v. *New York,* 143 U. S. 517; *People* v. *Weller,* 237 N. Y. 322; *Adkins* v. *Childrens Hospital,* 261 U. S. 525; *Adair* v. *United States,* 208 U. S. 174; *Coppage* v. *Kansas,* 236 U. S. 14. Distinguishing, *Wilson* v. *New,* 243 U. S. 322; *Block* v. *Hirsh,* 256 U. S. 135; *Brown Holding Co.* v. *Feldman,* 256 U. S. 170; and *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242. Other applicable decisions are, *Adams* v. *Tanner,* 244 U. S. 590; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Carrollton* v. *Bazette,* 159 Ill. 283; *People ex rel. Moskowitz* v. *Jenkins,* 202 N. Y. 53; *People ex rel. Tyroler* v. *Warden,* 157 N. Y. 116; *Collister* v. *Hayman,* 183 N. Y. 250; *Producers Transp. Co.* v. *R. R. Comm'rs,* 251 U. S. 230; *Pub. Util. Comm.* v. *Duke,* 266 U. S. 570; *Frost* v. *R. R. Comm.,* 271 U. S. 583.

Power to fix the price of theatre tickets was denied in *People* v. *Newman,* 109 Misc. Rep. 622; *Ex parte Quarg,* 149 Cal. 79; *People* v. *Steele,* 231 Ill. 340; *Chicago* v. *Powers,* 231 Ill. 531; *People* v. *Weiner,* 271 Ill. 74; *Chicago* v. *Netcher,* 183 Ill. 104; *People ex rel. Cort* v. *Thompson,* 283 Ill. 87. *Opinion of the Justices,* 247 Mass. 589, was merely an advisory opinion.

Neither the business of conducting a theatre nor that of a ticket broker is affected with a public interest. *Wolff Packing Co.* v. *Industrial Court,* 262 U. S. 522; 267 U. S.

552; *Dorchy* v. *Kansas,* 264 U. S. 286; *National Bank* v. *Mechanics Nat. Bank,* 94 U. S. 438; *Rensselaer Glass Factory* v. *Reid,* 5 Cowen 608; *Gray* v. *Bennet,* 3 Metc. 522; *Dunham* v. *Gould,* 16 Johns. 367; *Houghton* v. *Page,* 2 N. H. 42; *Mason* v. *Callender,* 2 Minn. 350; *Kermot* v. *Ayer,* 11 Mich. 181; *Adriance* v. *Brooks,* 13 Tex. 279. Such cases as *Munn* v. *Illinois,* 94 U. S. 113; and *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389, proceed upon the principle that an emergency existed. See *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 293, and *Adkins* v. *Childrens Hospital, supra.* *Terminal Taxicab Co.* v. *District of Columbia,* 241 U. S. 252, distinguished. See also *Yellow Taxicab Co.* v. *Gaynor,* 82 Misc. Rep. 94; *Schmidinger* v. *Chicago,* 226 U. S. 578; *Burns Baking Co.* v. *Bryan,* 264 U. S. 505; *People ex rel. Armstrong* v. *Warden,* 183 N. Y. 226. That even a theatre, and *a fortiori,* those who are engaged in the business of selling tickets entirely outside of the theatre, do not come within the purview of the doctrine on which the State relies, is apparent from the decisions in *Collister* v. *Hayman,* 183 N. Y. 250; *People ex rel. Burnham* v. *Flynn,* 189 N. Y. 160; *Aaron* v. *Ward,* 203 N. Y. 355, and *Wolcott* v. *Shubert,* 217 N. Y. 212. *People* v. *King,* 110 N. Y. 418 distinguished. *People ex rel. Cort* v. *Thompson,* 283 Ill. 87.

*Mr. Felix C. Benvenga,* with whom *Messrs. Robert D. Petty* and *Edwin B. McGuire* were on the brief, for appellee Banton.

The Court of Appeals of the State of New York has upheld the statute in its entirety, *People* v. *Weller,* 237 N. Y. 316; aff'g 207 App. Div. 337, and this Court has upheld it in part, *Weller* v. *New York,* 268 U. S. 319. The statute was passed in 1922. During 1923, at least three states passed statutes relating to the sale of tickets to places of amusement. Illinois, L. 1923, p. 323; New Jersey, L. 1923, p. 143, ch. 71; Connecticut, L. 1923, ch.

48. During 1924, while a similar bill was pending in the Massachusetts Senate, the Justices of the Supreme Judicial Court, in a carefully considered advisory opinion, in which *People* v. *Weller, supra,* was cited with approval, advised the Senate that the bill before it was constitutional. *Opinion of the Justices,* 247 Mass. 589. Thereafter, an act was passed, containing the substantial features of the proposed bill. See Ls. Massachusetts, 1924, c. 497, p. 551. The conception of different law-making bodies that the business of selling theatre tickets so far affects the public welfare as to require legislative regulation, cannot have been accidental and without cause. *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389. Their determination, after investigation, must have great weight. *McLean* v. *Arkansas,* 211 U. S. 539; *Patsone* v. *Pennsylvania,* 232 U. S. 138; *Radice* v. *New York,* 264 U. S. 292; *Jones* v. *Portland,* 245 U. S. 217; *Block* v. *Hirsh,* 256 U. S. 135; *Armour* v. *North Dakota,* 240 U. S. 510; *People ex rel. Durham* v. *La Fetra,* 230 N. Y. 429; *Schieffelin* v. *Hylan,* 236 N. Y. 254. In determining whether local conditions justify state legislation, this Court should not only give great weight to the estimate of the state Legislature as to the existence of evils, but should give a cumulative effect to the recognition of the courts of the same state that those evils exist. *Green* v. *Frazier,* 253 U. S. 233; *Jones* v. *Portland,* 245 U. S. 217; *People* v. *Newman,* 109 Misc. Rep. 622; *People* v. *Weller, supra.* To concede that the only cure for the evil is some remedy initiated by the managers of the theatres is to admit that the State is powerless to promote the general welfare of the people and to accomplish the purposes for which governments are founded. *People ex rel. Durham* v. *La Fetra, supra; People* v. *Weller, supra.*

The extent to which regulation may reasonably go depends upon the nature of the business—whether it is

" affected with a public interest "; the fact that it closely
touches a great many people, and that it may afford op-
portunities for imposition and oppression, as in cases of
monopoly and the like.    The business of conducting a
theatre, though in one sense private, is not " strictly "
private; it is a business that is " affected with a public
interest," *People* v. *King,* 110 N. Y. 418; *Aaron* v. *Ward,*
203 N. Y. 351; *People* v. *Weller,* 237 N. Y. 322; *People
ex rel. Cort Theatre Co.* v. *Thompson,* 283 Ill. 87; *Opin-
ion of the Justices,* 247 Mass. 589.  It is because the busi-
ness is affected with a public interest that governmental
regulation is justified.   As the population becomes more
congested in great cities, as the hours of labor become
shorter, the necessity of affording recreation, amusement
and education to the inhabitants becomes more impera-
tive.    Therefore, the theatre becomes more essential to
the welfare of the public; it becomes more " affected with
a public interest."   *People* v. *Weller, supra;* 37 Harvard
L. R. 1127.   Historically considered, theatres may be
regarded as so affected.   The Attic Theatre, Haigh, [3d
ed.] p. 4, 330; Theatre of the Greeks, Donaldson, 309;
15 Amer. Cyc. 685; 26 Ency. Brit. [11th ed.] 736; Law
of the Theatre, Wandell, p. 3.   And in the United States,
theatres have been subject to governmental regulation
from earliest times, *Opinion of the Justices, supra; Peo-
ple ex rel. Cort* v. *Thompson, supra; Cecil* v. *Green,* 161
Ill. 265.   The modern trend is shown by 19 R. C. L. 722.
See also *Egan* v. *San Francisco,* 165 Cal. 576; *Los Angeles*
v. *Lodge,* 51 Cal. App. 492; *Schieffelin* v. *Hylan,* 236 N. Y.
254; *People ex rel. Cort* v. *Thompson, supra.*

If the business of conducting a theatre is a business
affected with a public interest, that of reselling theatre
tickets is also affected.   *Opinion of the Justices, supra;
People* v. *Weller, supra.*   Assuming that the business may
not, in its origin, have been affected with a public interest,
yet because of the abuses which have grown up in con-

nection with it, it has become so affected. *German Alliance Ins. Co. v. Lewis, supra.* Although the mere declaration by a legislature that a business is affected with a public interest is not conclusive of the question whether its attempted regulation on that ground is justified, yet the indication by the legislature of its own purposes may certainly, in some degree, guide the courts in their consideration of the validity of the legislative assertion of power. *People v. Weller, supra; Block v. Hirsh, supra; Opinion of the Justices, supra.* The general principle is that a state legislature may, under its police power, regulate prices and charges; that the extent to which regulation may reasonably go depends upon the nature of the business—whether it is "affected with a public interest"; the fact that it touches a great many people, and that it may afford opportunities for imposition and oppression, as cases of monopoly and the like. *Munn v. Illinois,* 94 U. S. 113; *Budd v. New York,* 143 U. S. 517; *Brass v. Stoeser,* 153 U. S. 391; *German Alliance Ins. Co. v. Lewis,* 233 U. S. 389; *Block v. Hirsh, supra; Brown v. Feldman,* 256 U. S. 170; *Wolff Packing Co. v. Industrial Court,* 262 U. S. 522. Since *Munn v. Illinois* (1876), this method of regulation has been familiar in all American courts, and many kinds of business carried on without special franchises or privileges have been treated as public in character, and declared subject to legislative control. *Ratcliff v. Stockyards Co.,* 74 Kan. 1; *Opinion of the Justices, supra,* and many cases cited therein. The illustrations given in the cases cited show that the doctrine of the *Munn* case has not only been adhered to, but has been expanded and advanced to meet conditions as they arose. Burdick, Law of the Constitution, § 272; *Producers Transp. Co. v. R. R. Comm.,* 251 U. S. 228; *People ex rel. Durham v. La Fetra, supra; Frost v. R. R. Comm.,* 271 U. S. 589; *People v. King,* 110 N. Y. 418; *Aaron v. Ward,* 203 N. Y. 351; *Civil Rights Cases,* 109 U. S. 3, dissent.

When evils are admitted, great discretion should be allowed the legislature in devising remedies. If it has been demonstrated by experience that a remedy is not sufficient to check the evil, then certainly the legislature can, under the police power, adopt a new and more drastic remedy. Power to adopt new remedies when old remedies fail is illustrated by the legislation as to lotteries, carrying concealed weapons and regulating the sale of intoxicating liquors. *Ford* v. *State* 85 Md., 465; *Noble State Bank* v. *Haskell,* 219 U. S. 104; *Collister* v. *Hayman, supra.* The Legislature was under a duty to pass the present statute and fix a rate. Its inaction would have been a confession that it was powerless to secure to its citizens the blessings of freedom and to promote the general welfare. *People ex rel. Durham* v. *La Fetra* 230 N. Y. 429; *People* v. *Schweinler Press,* 214 N. Y. 395; *State* v. *Harper,* 148 Wis. 57; *Lawton* v. *Steele,* 152 U. S. 133.

*Mr. Robert P. Beyer,* Deputy Attorney General of New York, with whom *Mr. Albert Ottinger,* Attorney General, was on the brief, for appellee Murphy.

Mr. Justice Sutherland delivered the opinion of the Court.

Appellant is engaged in the business of reselling tickets of admission to theatres and other places of entertainment in the City of New York. It employs a large number of salesmen, messenger boys and others. Its expenses are very large, and its sales average approximately 300,000 tickets per annum. These tickets are obtained either from the box office of the theatre or from other brokers and distributors. It is duly licensed under § 168, c. 590, New York Laws, 1922, and has given a bond under § 169 of that chapter in the penal sum of $1,000 with sureties, conditioned, among other things, that it will not be guilty of any fraud or extortion. See *Weller* v. *New York,* 268 U. S. 319, 322.

Section 167 of chapter 590 declares that the price of or charge for admission to theatres, etc., is a matter affected with a public interest and subject to state supervision in order to safeguard the public against fraud, extortion, exorbitant rates and similar abuses.  Section 172 forbids the resale of any ticket or other evidence of the right of entry to any theatre, etc., "at a price in excess of fifty cents in advance of the price printed on the face of such ticket or other evidence of the right of entry," such printing being required by that section.  Both sections are reproduced in the margin.*

This suit was brought to enjoin respondents from proceeding either at law or in equity to enforce the last named section, and from revoking plaintiff's license, enforcing by suit or otherwise the penalty of the bond or prosecuting criminally appellant or any of its officers or agents for reselling or attempting to resell any ticket or other evidence of the right of entry to any theatre, etc., at a price in excess of fifty cents in advance of the printed

---

* § 167. *Matters of Public Interest.*  It is hereby determined and declared that the price of or charge for admission to theatres, places of amusement or entertainment, or other places where public exhibitions, games, contests or performances are held is a matter affected with a public interest and subject to the supervision of the state for the purpose of safeguarding the public against fraud, extortion, exorbitant rates and similar abuses.

§ 172. *Restriction as to Price.*  No licensee shall resell any such ticket or other evidence of the right of entry to any theatre, place of amusement or entertainment, or other place where public exhibitions, games, contests or performances are given at a price in excess of fifty cents in advance of the price printed on the face of such ticket or other evidence of the right of entry.  Every person, firm, or corporation who owns, operates or controls a theatre, place of amusement or entertainment, or other place where public exhibitions, games, contests or performances are held shall, if a price be charged for admission thereto, print on the face of each such ticket or other evidence of the right of entry the price charged therefor by such person, firm or corporation.

price. The bill alleges threats on the part of appellees to enforce the statute against appellant, to forfeit its license, enforce the penalty of its bond and institute criminal prosecutions against appellant, its officers and agents. It is further alleged that the terms of the statute are so drastic and the penalties for its violation so great [imprisonment for one year or a fine of $250 or both] that appellant may not resell any ticket or evidence of the right of entry at a price beyond that fixed by the statute even for the purpose of testing the validity of the law; and that appellant will be compelled to submit to the statute whether valid or invalid unless its suit be entertained, and thereby will be deprived of its property and liberty without due process of law and denied the equal protection of the law, in contravention of the Fourteenth Amendment to the federal Constitution. Following the rule frequently announced by this court, that "equitable jurisdiction exists to restrain criminal prosecutions under unconstitutional enactments, when the prevention of such prosecutions is essential to the safeguarding of rights of property," we sustain the jurisdiction of the district court. *Packard* v. *Banton,* 264 U. S. 140, 143, and cases there cited.

The case was heard below by a statutory court of three judges and a decree rendered denying appellant's prayer for a temporary injunction and holding the statute assailed to be valid and constitutional. The provision of the statute in question also has been upheld in a judgment of the New York state court of appeals, *People* v. *Weller,* 237 N. Y. 316, brought here on writ of error. That case, however, directly involved only § 168, requiring a license, and although it was insisted that § 172 restricting prices should also be considered, upon the ground that the two provisions were inseparable, this court held otherwise, sustained the validity of the license section and declined to

pass upon the other one. *Weller* v. *New York*, 268 U. S. 319, 325.

Strictly, the question for determination relates only to the maximum price for which an entrance ticket to a theatre, etc., may be resold. But the answer necessarily must be to a question of greater breadth. The statutory declaration (§ 167) is that the price of or charge for admission to a theatre, place of amusement or entertainment or other place where public exhibitions, games, contests or performances are held, is a matter affected with a public interest. To affirm the validity of § 172 is to affirm this declaration completely, since appellant's business embraces the resale of entrance tickets to all forms of entertainment therein enumerated. And since the ticket broker is a mere appendage of the theatre, etc., and the *price of* or *charge for admission* is the essential element in the statutory declaration, it results that the real inquiry is whether every public exhibition, game, contest or performance, to which an admission charge is made, is clothed with a public interest, so as to authorize a law-making body to fix the maximum amount of the charge, which its patrons may be required to pay.

In the endeavor to reach a correct conclusion in respect of this inquiry, it will be helpful, by way of preface, to state certain pertinent considerations. The first of these is that the right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself, *Case of the State Freight Tax*, 15 Wall. 232, 278, and, as such, within the protection of the due process of law clauses of the Fifth and Fourteenth Amendments. See *City of Carrollton* v. *Bazzette*, 159 Ill. 284, 294. The power to regulate property, services or business can be invoked only under special circumstances; and it does not follow that because the power may exist to regulate in some particulars it exists to regulate in others or in all.

The authority to regulate the conduct of a business or to require a license, comes from a branch of the police power which may be quite distinct from the power to fix prices. The latter, ordinarily, does not exist in respect of merely private property or business, *Chesapeake & Potomac Tel. Co.* v. *Manning,* 186 U. S. 238, 246, but exists only where the business or the property involved has become "affected with a public interest." This phrase, first used by Lord Hale 200 years ago, *Munn* v. *Illinois,* 94 U. S. 113, 126, it is true, furnishes at best an indefinite standard, and attempts to define it have resulted, generally, in producing little more than paraphrases, which themselves require elucidation. Certain properties and kinds of business it obviously includes, like common carriers, telegraph and telephone companies, ferries, wharfage, etc. Beyond these, its application not only has not been uniform, but many of the decisions disclose the members of the same court in radical disagreement. Its full meaning, like that of many other generalizations, cannot be exactly defined;— it can only be approximated.

A business is not affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance. Nor is the interest meant such as arises from the mere fact that the public derives benefit, accommodation, ease or enjoyment from the existence or operation of the business; and while the word has not always been limited narrowly as strictly denoting "a right," that synonym more nearly than any other expresses the sense in which it is to be understood.

The characterizations in some decisions of businesses as "*quasi* public," *People* v. *King,* 110 N. Y. 418, 428, "not 'strictly' private," *Aaron* v. *Ward,* 203 N. Y. 351, 356, and the like, while well enough for the purpose for which they were employed, namely, as a basis for upholding police regulations in respect of the conduct of particular

businesses, cannot be accepted as equivalents for the description " affected with a public interest," as that phrase is used in the decisions of this court as the basis for legislative regulation of prices. The latter power is not only a more definite and serious invasion of the rights of property and the freedom of contract, but its exercise cannot always be justified by circumstances which have been held to justify legislative regulation of the manner in which a business shall be carried on.

And, finally, the mere declaration by the legislature that a particular kind of property or business is affected with a public interest is not conclusive upon the question of the validity of the regulation. The matter is one which is always open to judicial inquiry. *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 536.

In the *Wolff* case, this court held invalid the wage fixing provision of the compulsory arbitration statute of Kansas as applied to a meat packing establishment. The power of a legislature, under any circumstances, to fix prices or wages in the business of preparing and selling food was seriously doubted, but the court concluded that, even if the legislature could do so in a public emergency, no such emergency appeared, and, in any event, the power would not extend to giving compulsory continuity to the business by compulsory arbitration. In the course of the opinion (p. 535), it was said that business characterized as clothed with a public interest might be divided into three classes:

"(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.

"(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest

times, has survived the period of arbitrary laws by Parliament or Colonial legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs and grist mills. *State* v. *Edwards,* 86 Me. 102; *Terminal Taxicab Co.* v. *District of Columbia,* 241 U. S. 252, 254.

"(3) Businesses which though not public at their inception may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly." Citing the *Munn* case and others.

If the statute now under review can be sustained as valid, it must be in virtue of the doctrine laid down in the third paragraph; and it will aid in the effort to reach a correct conclusion in that respect if we shall first consider the principal decisions of this court where that doctrine has been applied. The leading, as well as the earliest, definite decision dealing with a business falling within that class is *Munn* v. *Illinois, supra,* which sustained the validity of an Illinois statute fixing the maximum charge to be made for the use of elevators and warehouses for the elevation and storage of grain.

As ground for that decision the opinion recites, among other things, that grain came from the west and northwest by water and rail to Chicago where the greater part of it was shipped by vessel to the seaboard and some of it by railway to eastern ports; that Chicago had been made the greatest grain market in the world; and that the business had created a demand for means by which the immense quantity of grain could be handled or stored and these had been found in grain elevators. In this way the largest

traffic between the country north and west of Chicago and that lying on the Atlantic coast north of Washington, was in grain passing through the elevators at Chicago. The trade in grain between seven or eight of the great states of the west and four or five of those lying on the sea-shore, formed the largest part of the interstate commerce in these states. The elevators in Chicago were immense structures, holding from 300,000 to 1,000,000 bushels at one time. Under these circumstances, it was said that the elevators stood in the very " gateway of commerce " and took toll from all who passed; that their business certainly tended to a common charge and had become a thing of public interest and use; that every bushel of grain for its passage paid a toll, which was a common charge; and, finally, that if any business could be clothed " with a public interest, and cease to be *juris privati* only," this had been made so by the facts.

There is some general language in the opinion which, superficially, might seem broad enough to cover cases like the present one. It was said, for example (p. 126): " Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large." Literally, that would include all the large industries and some small ones; but in accordance with the well settled rule the words must be limited to the case under consideration. *Cohens* v. *Virginia,* 6 Wheat. 264, 399; *Plumley* v. *Massachusetts,* 155 U. S. 461, 474. Indeed, the language quoted is qualified immediately by a statement of the general rule, that— " When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created."

The significant requirement is that the property shall be devoted to a use in which the public has an interest,

which simply means, as in terms it is expressed at page 130, that it shall be devoted to " a public use." Stated in another form, a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been *devoted* to a public use and its use thereby, in effect, *granted* to the public. See *Louisville &c. R. R. Co.* v. *West Coast Co.,* 198 U. S. 483, 500. The subsequent elevator and warehouse cases, *Budd* v. *New York,* 143 U. S. 517, and *Brass* v. *Stoeser,* 153 U. S. 391, while presenting conditions of less gravity, rest upon the authority of the *Munn* case. The differences among the three cases are in matters of degree.

In *Cotting* v. *Kansas City Stock Yards Co., &c.,* 183 U. S. 79, 85, Mr. Justice Brewer, speaking on that point for himself and two other members of the court, said that, tested by the *Munn* case, the stock yards of the company, situated in one of the gateways of commerce and so located that they furnished important facilities to all seeking transportation of cattle, were subject to governmental price regulation. But the majority of the court, without referring to this view, assented to a reversal upon a ground specifically stated (pp. 114–115); and the authority of the case must be limited by the terms of that statement.

*German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389, carries the doctrine further and marks the extreme limit to which this court thus far has gone in sustaining price fixing legislation. There the court said that a business might be affected with a public interest so as to permit price regulation although no public trust was impressed upon the property and although the public might not have a legal right to demand and receive service; and it was held that fire insurance was such a business. Mr. Justice McKenna, speaking for the court, pointed out that in an insurance business each risk was not individual;

that "there can be standards and classification of risks, determined by the law of averages," and, while there might be variations, that rates are fixed and accommodated to such standards. Discussing the question whether the business was affected with a public interest so as to justify regulation of rates, it was then said (p. 406):

"And we mean a broad and definite public interest. In some degree the public interest is concerned in every transaction between men, the sum of the transactions constituting the activities of life. But there is something more special than this, something of more definite consequence, which makes the public interest that justifies regulatory legislation."

The business of common carriers, transmission of intelligence, furnishing water and light, gas and electricity, were cited as examples, and the *Munn, Budd* and *Brass* cases reviewed. The fact that the contract of fire insurance was personal in character, it was said, did not preclude regulation, and in that connection it was pointed out that insurance companies were so regulated by state legislation as to show that the law-making bodies of the country, without exception, regarded the business of insurance as so far affecting the public welfare as to invoke and require governmental regulation. And it was then said (p. 412–413):

"Accidental fires are inevitable and the extent of loss very great. The effect of insurance—indeed, it has been said to be its fundamental object—is to distribute the loss over as wide an area as possible. In other words, the loss is spread over the country, the disaster to an individual is shared by many, the disaster to a community shared by other communities; great catastrophes are thereby lessened, and, it may be, repaired. In assimilation of insurance to a tax, the companies have been said to be the mere machinery by which the inevitable losses by fire are distributed so as to fall as lightly as

possible on the·public at large,·the body of the insured, not the companies, paying the tax."

And again (p. 413):

" Contracts of insurance, therefore, have greater public consequence than contracts between individuals to do or not to do a particular thing whose effect stops with the individuals."

And again (p. 414):

" We have shown that the business of insurance has very definite characteristics, with a reach of influence and consequence beyond and different from that of the ordinary businesses of the commercial world, to pursue which a greater liberty may be asserted. The transactions of the latter are independent and individual, terminating in their effect with the instances. The.contracts of insurance may be said to be interdependent. They cannot be regarded singly, or isolatedly, and the·effect of their relation is to create a fund of assurance and credit, the companies becoming the depositories of the money of the insured, possessing great power thereby and charged with great responsibility."

Answering the objection that the reasoning of the opinion would subject every act of human endeavor and the price. of every article of human use to regulation, it was said (p. 415):

"And both by the expression of the principle and the citation of the examples we have tried to confine our decision to the regulation of the business of insurance, it having become ' clothed with a public interest,' and therefore subject ' to be·controlled by the public for the common good.' "

This observation fairly may be regarded as a warning at least to be cautious about invoking the decision as a precedent for the determination of cases involving other kinds of business. And this view is borne out by a general consideration of the case. The decision proceeds

upon the ground that the insurance business is to be distinguished from ordinary private business; that an insurance company, in effect, is an instrumentality which gathers funds upon the basis of equality of risk from a great number of persons—sufficiently large in number to cause the element of chance to step out and the law of averages to step in as the controlling factor,—and holds the numerous amounts so collected as a general fund to be paid out to those who shall suffer losses. Insurance companies do not sell commodities;—they do not sell anything. They are engaged in making contracts with and collecting premiums from a large number of persons, the effect of their activities being to constitute a guaranty against individual loss and to put a large number of individual contributions into a common fund for the purpose of fulfilling the guaranty. In this fund all are interested, not in some vague or sentimental way, but in a very real, practical and definite sense. It was from the foregoing and other considerations peculiar to the insurance business that the court drew its conclusion that the business was clothed with a public interest.

*Wilson* v. *New,* 243 U. S. 332 (involving the Adamson law), *Block* v. *Hirsh,* 256 U. S. 135, and *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170 (the rental cases), are relied upon to sustain the statute now under review. But in these cases the statutes involved were of a temporary character, to tide over grave emergencies, *Adkins* v. *Children's Hospital,* 261 U. S. 525, 551–552, the emergency in the *New* case being of nation-wide extent; and it is clear that, in the opinion of this court, at least the business of renting houses and apartments is not so affected with a public interest as to justify legislative fixing of prices unless some great emergency exists. *Block* v. *Hirsh, supra,* p. 157; *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543, 548. And even with the emergency, the stat-

utes " went to the verge of the law." *Penna. Coal Co.* v. *Mahon,* 260 U. S. 393, 416.

Nor is the sale of ordinary commodities of trade affected with a public interest so as to justify legislative price fixing. This court said in *Wolff Co.* v. *Industrial Court, supra,* p. 537:

" It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by State regulation. It is true that in the days of the early common law an omnipotent Parliament did regulate prices and wages as it chose, and occasionally a Colonial legislature sought to exercise the same power; but nowadays one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances."

See also, *United States* v. *Bernstein,* 267 Fed. 295, 296.

From the foregoing review it will be seen that each of the decisions of this court upholding governmental price regulation, aside from cases involving legislation to tide over temporary emergencies, has turned upon the existence of conditions, peculiar to the business under consideration, which bore such a substantial and definite relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use.

Lord Hale's statement that when private property is " affected with a public interest, it ceases to be *juris privati* only," is accepted by this court as the guiding principle in cases of this character. That this phrase was not intended by its author to include private undertakings, like those enumerated in the statute now under consid-

eration, is apparent when we consider the connection in which it was used. It occurs in Lord Hale's manuscript, *De Portibus Maris,* 1 Harg. Law Tracts, 78, in which the three-fold rights of the proprietor, the public and the king in ports are considered. It first is pointed out that no man can erect a public port without the king's license, though if he set up a port for his private advantage he may take what rates he and his customers can agree upon. But, it is said, if the king or the subject have a public wharf, to which all persons must come, because it is the wharf only licensed by the king, or there is no other wharf in that port, arbitrary and excessive charges cannot be made. For it is then affected with a public interest and ceases to be *juris privati* only; "as if a man set out a street in new building on his own land, it is now no longer bare private interest, but it is affected with a public interest."

It is clear that, as there announced, the rule is confined to conveniences made public because the privilege of maintaining them has been *granted* by government or because there has arisen what may be termed a *constructive grant* of the use to the public. That this is what Lord Hale had in mind is borne out, and the question now under consideration is illuminated, by the illustration, which he evidently conceived to be pertinent, of a street opened to the public, in which case the assumed grant and resulting public right of use is very apparent.

A theatre or other place of entertainment does not meet this conception of Lord Hale's aphorism or fall within the reasons of the decisions of this court based upon it. A theatre is a private enterprise, which, in its relation to the public, differs obviously and widely, both in character and degree, from a grain elevator, standing at the gateway of commerce and exacting toll, amounting to a common charge, for every bushel of grain which passes on its way among the states; or stock yards, standing in

like relation to the commerce in live stock; or an insur-
ance company, engaged, as a sort of common agency, in
collecting and holding a guaranty fund in which definite
and substantial rights are enjoyed by a considerable por-
tion of the public sustaining interdependent relations in
respect of their interests in the fund. Sales of theatre
tickets bear no relation to the commerce of the country;
and they are not interdependent transactions, but stand,
both in form and effect, separate and apart from each
other, " terminating in their effect with the instances."
And, certainly, a place of entertainment is in no legal
sense a public utility; and, quite as certainly, its activi-
ties are not such that their enjoyment can be regarded
under any conditions from the point of view of an
emergency.

The interest of the public in theatres and other places
of entertainment may be more nearly, and with better
reason, assimilated to the like interest in provision stores
and markets and in the rental of houses and apartments
for residence purposes; although in importance it falls
below such an interest in the proportion that food and
shelter are of more moment than amusement or instruc-
tion. As we have shown, there is no legislative power to
fix the prices of provisions or clothing or the rental charges
for houses or apartments, in the absence of some con-
trolling emergency; and we are unable to perceive any
dissimilarities of such quality or degree as to justify a
different rule in respect of amusements and entertain-
ments.

A theatre ticket may be in the form of a revocable
license or of a contract. If the former, it may be revoked
at the will of the proprietor; if the latter, it may be made
non-transferable or otherwise conditioned. A theatre, of
course, may be regulated so as to preserve the public
peace, insure good order, protect public morals, and the
like. A license may be required, but such a license is

not a franchise which puts the proprietor under the duty of furnishing entertainment to the public or, if furnished, of admitting everyone who applies. See *Collister* v. *Hayman*, 183 N. Y. 250, 253. How far the power of the legislature may be exerted to prevent discriminating selection by the proprietor of his patrons upon the basis of race, color, creed, etc., *People* v. *King*, 110 N. Y. 418, need not be determined; for in any event such power and the other powers of regulation just enumerated fall far short of the one here invoked to fix prices.

The contention that, historically considered, places of entertainment may be regarded as so affected with a public interest as to justify legislative regulation of their charges, does not seem to us impressive. It may be true, as asserted, that, among the Greeks, amusement and instruction of the people through the drama was one of the duties of government. But certainly no such duty devolves upon any American government. The most that can be said is that the theatre and other places of entertainment, generally have been regarded as of high value to the people, to be encouraged, but, at the same time, regulated, within limits already stated. While theatres have existed for centuries and have been regulated in a variety of ways, and while price fixing by legislation is an old story, it does not appear that any attempt hitherto has been made to fix their charges by law. This is a fact of some significance in connection with the historical argument, and, when set in contrast with the practice in respect of inn-keepers and others, whose charges have been subjected to legislative regulation from a very early period, it persuasively suggests that by general legislative acquiescence theatres, historically, have been regarded as falling outside the classes of things which should be thus controlled. It will not do to say that this failure of legislative bodies to act in the matter has been due to the absence of complaints on the part of the public,

for it hardly is probable that a privilege as ancient and as amply exercised as that of complaining about prices in general, has not been freely indulged in the matter of charges for entertainment. Indeed, it is judicially recorded that, as long ago as 1809, there was a riot in the Royal Theatre, London, for the purpose of compelling a reduction in prices of admission. In deciding a case growing out of the disturbance, *Clifford* v. *Brandon*, 2 Campb. 358, 368, the court summarily disposed of the claim that people had a right to express their disapprobation of high prices in such a tumultuous manner, by saying that " the proprietors of a theatre have a right to manage their property in their own way, and to fix what prices of admission they think most for their own advantage," and that any person who did not approve could stay away.

If it be within the legitimate authority of government to fix maximum charges for admission to theatres, lectures (where perhaps the lecturer alone is concerned), baseball, football and other games of all degrees of interest, circuses, shows (big and little), and every possible form of amusement, including the lowly merry-go-round with its adjunct, the hurdy-gurdy, *Commonwealth* v. *Bow*, 177 Mass. 347, it is hard to see where the limit of power in respect of price fixing is to be drawn.

It is urged that the statutory provision under review may be upheld as an appropriate method of preventing fraud, extortion, collusive arrangements between the management and those engaged in reselling tickets, and the like. That such evils exist in some degree in connection with the theatrical business and its ally, the ticket broker, is undoubtedly true, as it unfortunately is true in respect of the same or similar evils in other kinds of business. But evils are to be suppressed or prevented by legislation which comports with the Constitution, and not by such as strikes down those essential rights of private property protected by that instrument against undue governmental

interference.   One vice of the contention is that the stat-
ute itself ignores the righteous distinction between guilt
and innocence, since it applies wholly irrespective of the
existence of fraud, collusion or extortion (if that word
can have any legal significance as applied to transactions
of the kind here dealt with—*Commonwealth* v. *O'Brien
& others,* 12 Cush. 84, 90), and fixes the resale price as
well where the evils are absent as where they are present.
It is not permissible to enact a law which, in effect,
spreads an all-inclusive net for the feet of everybody
upon the chance that, while the innocent will surely be
entangled in its meshes, some wrong-doers also may be
caught.

What this court said in *Adams* v. *Tanner,* 244 U. S. 590,
594, in the course of its opinion holding invalid a statute
of Washington penalizing the collection of fees for secur-
ing employment, is apposite:

"Because abuses may, and probably do, grow up in
connection with this business, is adequate reason for hedg-
ing it about by proper regulations.   But this is not
enough to justify destruction of one's right to follow a
distinctly useful calling in an upright way.   Certainly
there is no profession, possibly no business, which does
not offer peculiar opportunities for reprehensible prac-
tices; and as to every one of them, no doubt, some can
be found quite ready earnestly to maintain that its sup-
pression would be in the public interest.   Skillfully di-
rected agitation might also bring about apparent con-
demnation of any one of them by the public.   Happily
for all, the fundamental guaranties of the Constitution
cannot be freely submerged if and whenever some ostens-
ible justification is advanced and the police power
invoked."

The evil of collusive alliances between the proprietors
of theatres and ticket brokers or scalpers seems to have
been effectively dealt with in Illinois by an ordinance

which required (1) that the price of every theat e ticket shall be printed on its face and (2) that no proprietor, employee, etc., of a theatre shall receive or enter into any arrangement or agreement to receive more. This ordinance was sustained as valid by the state supreme court in *The People* v. *Thompson*, 283 Ill. 87, 97; and that decision is cited here in support of the present statute. But the important distinction between that case and this is that the ordinance did not forbid the resale of the ticket by a purchaser of it for any price he was able to secure, or forbid the fixing of any price by the proprietor which he thought fit, provided that price was printed on the face of the ticket.

That court had held in the earlier case of *The People* v. *Steele*, 231 Ill. 340, 344, that the business of conducting a theatre was a private one; that the legislature had the power to regulate it as a place of public amusement and might require a license; that the legislature had the same power to regulate such a business as it had to regulate any other private business, and no more. And an act which prohibited the resale of tickets for more than the price printed thereon was held to be invalid as an arbitrary and unreasonable interference with the rights of the ticket broker. It was distinctly held that the intending purchaser of the ticket had no right to buy at any price except that fixed by the holder; that the manager might fix the price arbitrarily, and raise or lower it at his will; that having advertised a performance, he was not bound to give it, and having advertised a price, he was not bound to sell at that price; and that the business of dealing in theatre tickets and the right to contract with regard to them were entitled to protection. To the same effect, see *Ex parte Quarg*, 149 Cal. 79.

This doctrine was reaffirmed in the *Thompson* case, but held to have no application to the ordinance there considered and not to be inconsistent with the holding (p. 97)

that the manager of a place of public entertainment might " be compelled to treat patrons impartially by putting an end to an existing system by which theatre owners and ticket scalpers are confederated together to compel a portion of the public to pay a different price from others."

It should not be difficult similarly to define and penalize in specific terms other practices of a fraudulent character, the existence or apprehension of which is suggested in brief and argument. But the difficulty or even the impossibility of thus dealing with the evils, if that should be conceded, constitutes no warrant for suppressing them by methods precluded by the Constitution. Such subversions are not only illegitimate but are fraught with the danger that, having begun on the ground of necessity, they will continue on the score of expediency, and, finally, as a mere matter of course. Constitutional principles, applied as they are written, it must be assumed, operate justly and wisely as a general thing, and they may not be remolded by lawmakers or judges to save exceptional cases of inconvenience, hardship or injustice.

We are of opinion that the statute assailed contravenes the Fourteenth Amendment and that the decree must be

*Reversed.*

MR. JUSTICE HOLMES, dissenting.

We fear to grant power and are unwilling to recognize it when it exists. The States very generally have stripped jury trials of one of their most important characteristics by forbidding the judges to advise the jury upon the facts (*Graham* v. *United States,* 231 U. S. 474, 480), and when legislatures are held to be authorized to do anything considerably affecting public welfare it is covered by apologetic phrases like the police power, or the statement that the business concerned has been dedicated to a public use. The former expression is convenient, to be sure, to conciliate the mind to something that needs explanation: the fact that the constitutional requirement of compensation

when property is taken cannot be pressed to its grammatical extreme; that property rights may be taken for public purposes without pay if you do not take too much; that some play must be allowed to the joints if the machine is to work. But police power often is used in a wide sense to cover and, as I said, to apologize for the general power of the legislature to make a part of the community uncomfortable by a change.

I do not believe in such apologies. I think the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain. Coming down to the case before us I think, as I intimated in *Adkins* v. *Children's Hospital,* 261 U. S. 525, 569, that the notion that a business is clothed with a public interest and has been devoted to the public use is little more than a fiction intended to beautify what is disagreeable to the sufferers. The truth seems to me to be that, subject to compensation when compensation is due, the legislature may forbid or restrict any business when it has a sufficient force of public opinion behind it. Lotteries were thought useful adjuncts of the State a century or so ago; now they are believed to be immoral and they have been stopped. Wine has been thought good for man from the time of the Apostles until recent years. But when public opinion changed it did not need the Eighteenth Amendment, notwithstanding the Fourteenth, to enable a State to say that the business should end. *Mugler* v. *Kansas,* 123 U. S. 623. What has happened to lotteries and wine might happen to theatres in some moral storm of the future, not because theatres were devoted to a public use, but because people had come to think that way.

But if we are to yield to fashionable conventions, it seems to me that theatres are as much devoted to public use as anything well can be. We have not that respect for, art that is one of the glories of France. But to many people the superfluous is the necessary, and it seems to me that Government does not go beyond its sphere in attempting to make life livable for them. I am far from saying that I think this particular law a wise and rational provision. That is not my affair. But if the people of the State of New York speaking by their authorized voice say that they want it, I see nothing in the Constitution of the United States to prevent their having their will.

MR. JUSTICE BRANDEIS concurs in this opinion.

MR. JUSTICE STONE, dissenting.

I can agree with the majority that " constitutional principles, applied as they are written, it must be assumed, operate justly and wisely as a general thing, and they may not be remolded by lawmakers or judges to save exceptional cases of inconvenience, hardship, or injustice." But I find nothing written in the Constitution, and nothing in the case or common law development of the Fourteenth Amendment, which would lead me to conclude that the type of regulation attempted by the State of New York is prohibited.

The scope of our inquiry has been repeatedly defined by the decisions of this Court. As was said in *Munn* v. *Illinois,* 94 U. S. 113, 132, by Chief Justice Waite, "For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the state. But if it could, we must presume it did. Of the propriety of legislative interference within the scope of legislative power, the legisla-

ture is the exclusive judge." The attitude in which we should approach new problems in the field of price regulation was indicated in *German Alliance Ins. Co. v. Kansas,* 233 U. S. 389, 409: "Against that conservatism of the mind, which puts to question every new act of regulating legislation and regards the legislation invalid or dangerous until it has become familiar, government— state and National—has pressed on in the general welfare; and our reports are full of cases where in instance after instance the exercise of the regulation was resisted and yet sustained against attacks asserted to be justified by the Constitution of the United States. The dread of the moment having passed, no one is now heard to say that rights were restrained or constitutional guarantees impaired." Again, in sustaining the constitutionality of a zoning ordinance under the Fourteenth Amendment, this Court has recently said, "Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive." *Village of Euclid v. Ambler Realty Co.,* 272 U. S. 365.

The question with which we are here concerned is much narrower than the one which has been principally discussed by the Court. It is not whether there is constitutional power to fix the price which theatre owners and producers may charge for admission. Although the statute in question declares that the price of tickets of admission to places of amusement is affected with a public interest, it does not purport to fix prices of admission. The producer or theatre proprietor is free to charge any price he chooses. The statute requires only that the sale price, whatever it is, be printed on the face of the ticket, and prohibits the licensed ticket broker, an intermediary

in the marketing process, from reselling the ticket at an advance of more than fifty cents above the printed price.[1] Nor is it contended that this limit on the profit is unreasonable. It appears affirmatively that the business is now being carried on profitably by ticket brokers under this very restriction. But if it were not, there could be judicial relief without affecting the constitutionality of the measure. In these respects, the case resembles *Munn* v. *Illinois, supra,* where the attempt was not to fix the price of grain but to fix the price of the service rendered by the proprietors of grain elevators in connection with the transportation and distribution of grain, the cost of which entered into the price ultimately paid by the consumer. The statute there, as the statute here, was designed in part to protect a large class of consumers from

---

[1] Turning to the broader question, the public importance of theatres has been manifested in regulatory legislation in this country from the earliest times. Beale, Innkeepers, § 325n; *Cecil* v. *Green,* 161 Ill. 265, 268. In New York, physical construction of theatres with respect to fire escapes, exits and seating is regulated, Village Law, § 90, par. 25; licenses to produce shows are required, Town Law, § 217; Sunday entertainments of certain kinds, Penal Code, § 2145, cf. *People* v. *Hoym,* 20 How. Prac. 76; *Neuendorff* v. *Duryea,* 6 Daly 276; discrimination because of race or color, Penal Code, § 514, *People* v. *King,* 110 N. Y. 418, or against persons wearing United States uniforms, Penal Code, § 517; appearance of children under fourteen upon the stage, *People* v. *Ewer,* 141 N. Y. 129; admission of children under sixteen, Penal Code, § 484; presentation of certain types of exhibitions, Penal Code, §§ 831, 833; or immoral shows and exhibitions, Penal Code, § 1140a; or plays in which a living character represents the Deity, Penal Code, § 2074; are all prohibited. Section 3657, Page, Ohio Gen. Code, empowering municipalities to require licensing of theatrical exhibitions and theatre ticket selling and § 12600-2 *et seq.* regulating physical construction, etc., are typical of present day statutes. This Court has upheld legislation regulating admissions to public entertainments, *Western Turf Association* v. *Greenberg,* 204 U. S. 359; and providing for censorship of motion pictures, *Mutual Film Corp.* v. *Ohio Industrial Commission,* 236 U. S. 230.

exorbitant prices made possible by the strategic position of a group of intermediaries in the distribution of a product from producer to consumer.

There are about sixty first class theatres in the borough of Manhattan. Brokers annually sell about two million tickets, principally for admission to these theatres. Appellant sells three hundred thousand tickets annually. The practice of the brokers, as revealed by the record, is to subscribe, in advance of the production of the play and frequently before the cast is chosen, for tickets covering a period of eight weeks. The subscriptions must be paid two weeks in advance and about twenty-five per cent. of the tickets unsold may be returned. A virtual monopoly of the best seats, usually the first fifteen rows, is thus acquired and the brokers are enabled to demand extortionate prices of theatre goers. Producers and theatre proprietors are eager to make these advance sales which are an effective insurance against loss arising from unsuccessful productions. The brokers are in a position to prevent the direct purchase of tickets to the desirable seats and to exact from the patrons of the successful productions a price sufficient to pay the loss of those which are unsuccessful, plus an excessive profit to the broker.

It is undoubtedly true as a general proposition that one of the incidents of the ownership of property is the power to fix the price at which it may be disposed. It may be also assumed that as a general proposition, under the decisions of this Court, the power of state governments to regulate and control prices may be invoked only in special and not well defined circumstances. But when that power is invoked in the public interest and in consequence of the gross abuse of private right disclosed by this record, we should make searching and critical examination of those circumstances which in the past have been deemed sufficient to justify the exercise of the power, before concluding that it may not be exercised here.

The phrase " business affected with a public interest "
seems to me to be too vague and illusory to carry us very
far on the way to a solution.   It tends in use to become
only a convenient expression for describing those busi-
nesses, regulation of which has been permitted in the past.
To say that only those businesses affected with a public
interest may be regulated is but another way of stating
that all those businesses which may be regulated are
affected with a public interest.   It is difficult to use the
phrase free of its connotation of legal consequences, and
hence when used as a basis of judicial decision, to avoid
begging the question to be decided.   The very fact that
it has been applied to businesses unknown to Lord Hale,
who gave sanction to its use, should caution us against
the assumption that the category has now become com-
plete or fixed and that there may not be brought into it
new classes of business or transactions not hitherto
included, in consequence of newly devised methods of
extortionate price exaction.

The constitutional theory that prices normally may
not be regulated rests upon the assumption that the
public interest and private right are both adequately pro-
tected when there is " free " competition among buyers
and sellers, and that in such a state of economic society,
the interference with so important an incident of the
ownership of private property as price fixing is not
justified and hence is a taking of property without due
process of law.

Statutory regulation of price is commonly directed
toward the prevention of exorbitant demands of buyers
or sellers.   An examination of the decisions of this Court
in which price regulation has been upheld will disclose
that the element common to all is the existence of a
situation or a combination of circumstances materially
restricting the regulative force of competition, so that
buyers or sellers are placed at such a disadvantage in the

bargaining struggle that serious economic consequences result to a very large number of members of the community. Whether this situation arises from the monopoly conferred upon public service companies or from the circumstance that the strategical position of a group is such as to enable it to impose its will in matters of price upon those who sell, buy or consume, as in *Munn* v. *Illinois, supra;* or from the predetermination of prices in the councils of those who sell, promulgated in schedules of practically controlling constancy, as in *German Alliance Ins. Co.* v. *Kansas, supra,* or from a housing shortage growing out of a public emergency as in *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170; *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242; cf. *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543, the result is the same. Self interest is not permitted to invoke constitutional protection at the expense of the public interest and reasonable regulation of price is upheld.

That should be the result here. We need not attempt to lay down any universal rule to apply to new and unknown situations. It is enough for present purposes that this case falls within the scope of the earlier decisions and that the exercise of legislative power now considered was not arbitrary. The question as stated is not one of reasonable prices, but of the constitutional right in the circumstances of this case to exact exorbitant profits beyond reasonable prices. The economic consequence of this regulation upon individual ownership is no greater, nor is it essentially different from that inflicted by regulating rates to be charged by laundries, *Oklahoma Operating Co.* v. *Love,* 252 U. S. 331 (*semble*), by anti-monopoly laws, Sunday laws, usury statutes, *Griffith* v. *Connecticut,* 218 U. S. 563; Workmen's Compensation Acts, *New York Central R. R.* v. *White,* 243 U. S. 188; the zoning ordinance upheld in *Village of Euclid* v. *Ambler Realty Co., supra;* or state statutes restraining the owner of land

from leasing it to Japanese or Chinese aliens, upheld in *Terrace* v. *Thompson,* 263 U. S. 197; *Webb* v. *O'Brien,* 263 U. S. 313; or state prohibition laws upheld in *Mugler* v. *Kansas,* 123 U. S. 623; or legislation prohibiting option contracts for future sales of grain, *Booth* v. *Illinois,* 184 U. S. 425, or invalidating sales of stock on margin or for "futures," *Otis* v. *Parker,* 187 U. S. 606; or statutes preventing the maintenance of pool parlors, *Murphy* v. *California,* 225 U. S. 623, or in numerous other cases in which the exercise of private rights has been restrained in the public interest. *Noble State Bank* v. *Haskell,* 219 U. S. 104; *Central Lumber Co.* v. *South Dakota,* 226 U. S. 157; *St. Louis Poster Advertising Co.* v. *St. Louis,* 249 U. S. 269; *Terminal Taxicab Co.* v. *Dist. of Columbia,* 241 U. S. 252; *Mutual Loan Co.* v. *Martell,* 222 U. S. 225; *Schmidinger* v. *Chicago,* 226 U. S. 578; cf. *Green* v. *Frazier,* 253 U. S. 233; *National Ins. Co.* v. *Wanberg,* 260 U. S. 71; *Clark* v. *Nash* 198 U. S. 361. Nor is the exercise of the power less reasonable because the interests protected are in some degree less essential to life than some others. Laws against monopoly which aim at the same evil and accomplish their end by interference with private rights quite as much as the present law are not regarded as arbitrary or unreasonable or unconstitutional because they are not limited in their application to dealings in the bare necessities of life.

The problem sought to be dealt with has been the subject of earlier legislation in New York and has engaged the attention of the legislators of other states.[2] That it is

---

[2] An earlier ordinance of New York City, substantially similar to the present act, was construed in *People* v. *Newman,* 109 Misc. 622, overruled by *People* v. *Weller,* 237 N. Y. 316. Section 1534 Penal Code, makes it a misdemeanor for brokers to sell tickets on the street.

Acts & Resolves of Mass. 1924, c. 497, controlling resale of tickets with maximum brokerage charges similar to the New York statute was approved in *Opinion of Justices,* 247 Mass. 497. Conn. Pub. Acts,

one involving serious injustice to great numbers of individuals who are powerless to protect themselves cannot be questioned. Its solution turns upon considerations of economics about which there may be reasonable differences of opinion. Choice between these views takes us from the judicial to the legislative field. The judicial function ends when it is determined that there is basis for legislative action in a field not withheld from legislative power by the Constitution as interpreted by the decisions of this Court. Holding these views, I believe the judgment below should be affirmed.

MR. JUSTICE HOLMES and MR. JUSTICE BRANDEIS join in this dissent.

MR. JUSTICE SANFORD, dissenting.

I regret that I cannot agree with the opinion of the Court in this case. My own view is more nearly that expressed by Mr. Justice Stone. Shortly stated, it is this: The case, I think, does not involve the question whether the business of theatre owners offering their separate entertainments is so affected with a public interest that the price which they themselves charge for tickets is subject to regulation by the legislature, but the very different question whether the business of ticket brokers who intervene between the theatre owners and the general public in the sale of theatre tickets is affected with a public interest, and may, under the circumstances disclosed in this case, be

1923, c. 48; New Jersey Laws 1923, c. 71; Cal. Penal Code, § 526, make it a misdemeanor to sell tickets in excess of the printed price. The California Act was declared unconstitutional in *Ex parte Quarg*, 149 Cal. 79. A similar statute in Illinois was held invalid, *People* v. *Steele*, 231 Ill. 340. A license ordinance of ticket peddlers was also declared invalid in California. *Ex parte Dees*, 46 Cal. App. 656. Those enactments are clearly more drastic than the New York statute. A Chicago ordinance prohibiting secret alliances and profit sharing between proprietors and scalpers was upheld. *People* v. *Thompson*, 283 Ill. 87. See also, Laws of Ill. 1923, p. 322.

regulated by the legislature to the extent of preventing them from selling tickets at more than a reasonable advance upon the theatre prices. The facts stated by Mr. Justice Stone are substantially those found by the District Court. They show, as I think, clearly, that the ticket brokers, by virtue of arrangements which they make with the theatre owners, ordinarily acquire an absolute control of the most desirable seats in the theatres, by which they deprive the public of access to the theatres themselves for the purpose of buying such tickets at the regular prices, and are enabled to exact an extortionate advance in prices for the sale of such tickets to the public.

In *Munn* v. *Illinois,* 94 U. S. 113, 132—although there was no holding that the sale of grain was in itself a business affected with a public interest which could be regulated by the legislature—it was held that the separate business of grain elevators, which " stood in the very gateway of commerce " in grain, " taking toll " from all who passed and tending to a common charge, had become, by the facts, clothed " with a public interest " and was subject to public regulation limiting the charges to a reasonable toll. So, I think, that here—without reference to the character of the business of the theatres themselves—the business of the ticket brokers, who stand in " the very gateway " between the theatres and the public, depriving the public of access to the theatres for the purchase of desirable seats at the regular prices, and exacting toll from patrons of the theatres desiring to purchase such seats, has become clothed with a public interest and is subject to regulation by the legislature limiting their charges to reasonable exactions and protecting the public from extortion and exorbitant rates. See *People* v. *Weller,* 207 App. Div. 337, 343, and 237 N. Y. 316, 331, in which the constitutionality of this statute was sustained by the New York courts; and *Opinion of the Justices to the Senate,* 247 Mass. 589, 598. And in *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 535, it was recognized that a business,

although not public at its inception, might become clothed with a public interest justifying some government regulation, by coming " to hold such a peculiar relation to the public that this is superimposed " upon it. This, I think, is the case here.