Cohen v. Schofield, Director of Public Safety, et al.

146

148

150

152

154

A. T. *Ashton,* G. C. *Farrier* and J. A. *Boyle,* for defendants, exceptants.
B. I. *De Young,* for plaintiffs, contra.

TAULANE, J., Dec. 18, 1929.—The plaintiff, Philip Cohen, has a Federal permit to manufacture a toilet preparation known as Parma Violet Perfume. One of its chief ingredients is denatured alcohol, but if manufactured according to the permit, it could not be redistilled or otherwise treated so as to be fit for beverage purposes.

Some 2000 gallons of said perfume, prepared by Cohen, one of the plaintiffs, and sold by him to Hoffberg, another plaintiff, while being transported by Kessler, a teamster, along the streets of the City of Philadelphia, were seized by the police on the ground that said perfume was not manufactured in accordance with the Federal permit, but contrary thereto, so that said perfume could be readily converted, by distillation or other process, into an alcoholic substance fit for beverage purposes.

Immediately upon its seizure, the perfume was delivered to the District Attorney for condemnation in accordance with the provisions of the Snyder Act (March 27, 1923, P. L. 34).

The plaintiffs filed a bill in this court, alleging that the perfume was manufactured in strict accordance with the permit; that it was not subject to seizure as a violation of the prohibition laws, and prayed that the perfume be returned to them, and the police officials be restrained by injunction from interfering with the lawful conduct of their business.

The defendants filed an answer, denying the allegations of the bill, and the issue so framed has been tried. The Trial Judge found that the perfume was manufactured in accordance with the permit, and that the plaintiffs are entitled to the relief prayed for.

As the perfume was seized as an alcoholic liquor, intended for use for beverage purposes in violation of the prohibition laws, and is in the possession of the District Attorney for condemnation, we think this court has no jurisdiction to determine whether the perfume was subject to seizure. The determination of that question is vested exclusively by the Snyder Act in the Court of Quarter Sessions on proceedings for condemnation by the District Attorney. If the perfume was manufactured in accordance with the permit, and was not intended for use for beverage purposes, of course, it could not be legally seized and condemned. And that is the question which the Court of Quarter Sessions will be obliged to decide in the condemnation proceedings already instituted by the District Attorney. If this is not the law, courts of equity, and not the Courts of Quarter Sessions, will be constantly called upon to determine questions of the right to seize and condemn illegal liquor.

Wherever the legislature provides a special remedy, that remedy is exclusive. Under no circumstances could we order the return of the perfume to the plaintiffs, because section 21 of the Act of Feb. 19, 1926, P. L. 16, 26, provides: "No property rights shall exist in any alcohol or alcoholic liquid manufactured, produced, distilled, developed, or used in the process of manufacture, denatured, redistilled, recovered, reused, held in bond, held in storage as bailee for hire, sold at wholesale, or transported for hire, in violation of any of the provisions of this act, and the same shall be deemed contraband and forthwith destroyed. No alcohol or alcoholic liquid in the custody of any officer of the law shall be seized or taken from him on any writ of replevin, injunction or other like process."

The Snyder Act provides a very complete and exclusive procedure for the seizure and condemnation of alcoholic liquids, and the framers of the act purposely excluded the intermeddling of courts of equity by injunctions or like orders.

The plaintiffs contend that section 21 has no application unless the alcoholic liquid violates the prohibition laws. In a sense, that may be true, but the moment an alcoholic substance is seized as a violation of law, the legality of the seizure must be determined by the Courts of Quarter Sessions. Should we adopt the plaintiffs' view, we would have a trial first in a court of equity, and if it be adverse to the claimant, he would have another opportunity in the Courts of Quarter Sessions.

We are satisfied that we are without jurisdiction and cannot order the return of the perfume to the plaintiffs.

A consideration of the merits of the case would not benefit the plaintiffs. The weight of the evidence suggests that the perfume was not manufactured according to the permit and that its sale and distribution was for illegal purposes. We are not called upon, however, to decide these questions, but leave them for decision in the condemnation proceedings.

We do not think an injunction should be issued against the police officials.

Courts of equity, as a general rule, have no jurisdiction or power to restrain or interfere with public officials in the enforcement of the criminal law: 32 Corpus Juris, 261. Courts of equity, in some instances, have issued injunctions to restrain the enforcement of an unconstitutional statute (Tyson v. United Theatre Ticket Offices, 273 U. S. 418) or to restrain police officers from doing some definite, concrete act, admittedly and concededly illegal. Even in such cases, courts of equity hesitate to interfere with the police.

Here the situation is different. The plaintiffs are engaged in a business where its lawfulness depends primarily upon the plaintiffs themselves. It has all sorts of ramifications leading to abuses and criminality. The police should have a free hand to enforce the liquor laws. We should not restrain them in advance or attempt to decide what they can and cannot do in enforcing the law. The circumstances of each case as it arises will determine what action the police should take. It would embarrass the police in the performance of their duties if they were obliged each time they considered there was a violation of the law to interpret our injunction, which at best would only be in the most general terms. It would mean little for us to restrain the police from interfering with the lawful conduct of the plaintiffs' business. If the plaintiffs conduct their business in a lawful manner, they need no injunction nor need they have any reasonable fear of police interference. We have no reason to believe that the police will molest the plaintiffs unless they violate the law. For any abuse of power on the part of the police the plaintiffs have ample redress in the civil and criminal law: Delaney v. Flood, 183 N. Y. 323.

The policy of courts of equity in refusing to interfere with the administration of the criminal law is admirably stated by Earl, J., in Davis v. American Society for the Prevention of Cruelty to Animals, 75 N. Y. 362, where he says: "A person threatened with arrest for keeping a bawdy-house or for violating the excise law, or even for the crime of murder, upon the allegation of his innocence of the crime charged, and of irreparable mischief which would follow his arrest, could always draw the question of his guilt or innocence from trial in the proper form. An innocent person, upon an accusation of crime, may be arrested and ruined in his character and property, and the damage he thus sustains is *damnum absque injuria*, unless the case is such that he can maintain an action for malicious prosecution or false imprisonment. He is exposed to the risks of such damage by being a member of an organized society, and his compensation for such risks may be found in the general welfare which society is organized to promote. This action is absolutely without sanction in the precedents or principles of equity."

158

We think the exceptions must be sustained.

*Judge McDevitt dissents and is of the opinion that an injunction should issue against the defendants as prayed for by the plaintiffs.*

And now, to wit, Dec. 18, 1929, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

1. Defendants' exceptions are sustained.
2. The bill is dismissed.
3. Plaintiffs to pay costs.

KUN, J., concurring.—In concurring with Judge Taulane, I deem it appropriate to make a few observations. Nothing should concern the people more than the matter of law enforcement. All their rights depend on it. While the term "law enforcement" has recently been used mostly in connection with the 18th Amendment and the so-called Prohibition Laws, I do not use it in that restricted sense. A breaking down of respect for law can but lead to its destruction. The problem has been recognized as sufficiently acute to lead the President of the United States to appoint a distinguished committee to study the whole question.

Undoubtedly, the wholesale violation of the liquor laws has been the consideration in this connection, which has particularly engaged the attention of right-minded officials and the courts. The forces which have been organized to circumvent and violate these laws have, as is well known, the most extensive ramifications. Their evil influences have reached into high places. They have debauched sworn officers of the law, while enriching them, as was disclosed not so long ago in this jurisdiction. The recent spectacular capture of their "fort" in northern New Jersey indicated the thoroughness of their organization. There is no limit to their cunning, ingenuity and resourcefulness.

These observations are made to emphasize the necessity for the exercise of the greatest caution by our courts in dealing with any phase of the subject. No doubt, many courts have been imposed upon and have unwittingly by their rulings given aid, comfort and protection to persons actually engaged in gross violations of the liquor laws, because they were ostensibly conducting innocent business. None of these comments may apply to the plaintiffs in these cases, but, as pointed out in the opinion of the court filed, the plaintiffs, as permittees, have it solely in their power to conduct their business according to law, or, as the police and the district attorney suspect, in gross violation thereof. If they prepare their product as required by their permits, and it goes into legitimate channels of trade, the police and the district attorney cannot interfere with them, any more than they could interfere with any other lawful business; and if it were shown that, notwithstanding repeated adjudications in the proper court, a permittee was doing business in strict compliance with the law, [and] the police continued to interfere with his business, a court of equity might restrain them.

However, the burden of showing strict compliance with the law, and that the product actually went into legitimate channels of trade and not to so-called "cover-up" houses, through which the product could get into illegitimate channels, would necessarily be on the complainant, and he would have to show the clearest kind of a case and the clearest right to such an extraordinary remedy as an injunction against the legally constituted police authorities. According to the records in these cases, it would seem that the burden was put on the defendants.

In the cases before the court (the above case and cases Nos. 16,675 and 16,677) there have been no adjudications by the proper tribunal—the Quarter

Sessions Court—of the fact questions involved. The plaintiffs, permittees, having had their products seized on the ground that they were unlawful, filed bills in equity to restrain the police and the district attorney (who was added as a defendant) from proceeding further against them. I join with my colleague, Judge Taulane, in holding that we are entirely without authority to grant such relief. In my opinion, such action would be a usurpation of the powers specifically given by law to the Quarter Sessions Court, where these cases are exclusively triable in the condemnation proceedings following such seizures. The statute expressly prohibits the removal of such seized products from the officials by "replevin, injunction or other like process." It seems to me that the granting of an injunction before seizure would in effect be an anticipatory violation of the statute which prohibits the return of the seized product by injunction after seizure.

Though, as stated by Judge Taulane, we are not called upon to decide the merits in these cases, I agree with him that on a consideration of the merits, the weight of the evidence suggests that the so-called perfumes seized in these cases were not manufactured according to the requirements of the permits, and, what is more important, the plaintiffs failed utterly to prove that their products were going into legitimate channels of trade. The clear inference from the testimony is that the products were to be redistilled and then put into illegitimate channels for distribution in violation of the law of the land.

I take it that, as a judge, I am to bring to bear, in considering cases, not only what limited knowledge of the law I may have but I am expected to apply also that knowledge which every one more or less has—a certain amount of common knowledge. Every man on the street knows that the increased traffic in "perfumes" and "hair tonics" by truck loads running into thousands of gallons, and the storing of thousands of gallons of such alleged products, as disclosed in the cases before the court, is not due to any wide-spread epidemic of baldness in this country, or to any sudden increase in the aromatic inclination of the people, but "perfumes" and "hair tonics" have been resorted to as the merest subterfuge for getting illicit liquor into circulation by the devious methods which have been devised by those in the business.

Considering the record facts in these cases and the reasonable inferences deducible therefrom, and the law applicable to cases of this sort, it was little short of audaciousness for the plaintiffs to have been bold enough to ask for an injunction against the police and the district attorney from interfering with their business. That they obtained an injunction in the first instance only proves that even so able a jurist as the President Judge of this court, who has done notable work in padlock cases, may be imposed upon. During the time the plaintiffs have had the injunction they have enjoyed what in effect has been for them a judicial license, under the protection of which they could (whether they did or not, they alone know) with impunity violate the law, the police being rendered helpless to interfere with them for fear of being committed for contempt. I cannot agree to any process which puts the police in any such position.

Experience proves, I think, that the cases are extremely rare in which police violate their duties by overzealousness in action. Their violations are rather in their failure to act in certain matters for one reason or another, as was recently disclosed. The instances must be quite extraordinary in which they can be properly restrained from acting, though, no doubt, there are many in which they should be made to act. That, however, is beyond our power as a court. The responsibility lies elsewhere.

In my opinion, there was no justification for granting the injunction in these cases. I, therefore, concur in sustaining the exceptions and in dismissing the bills.

MCDEVITT, P. J., dissenting, Dec. 24, 1929.—In this cause, in the opinion *nisi*, the court reviewed the evidence and extensively stated the law as it was found to be applicable to the facts presented. It would be surplusage, therefore, to go over the ground already covered in that opinion. There remains, then, but to point out what the Chancellor considers the error and inadequacy in the opinions filed by his colleagues, evidencing, as they do, a complete lack of comprehension of the testimony (580 pages) taken at the various hearings and their patent failure to consider the equitable relief prayed for.

They summarily dismiss the case for lack of equitable jurisdiction because of the provisions in the Snyder Act, and then, by way of extra-jurisdictional matter, arbitrarily state that the weight of the evidence suggests that the perfume was not manufactured according to the permit, and that its sale and distribution was for illegal purposes. Both opinions evidence a startling failure to absorb the atmosphere of the case as developed at the hearings. They completely ignore the important factor well recognized in determining the comparative value of conflicting testimony—the relative manner of the witnesses, expert and lay, in offering their testimony, the advantage of which comparison could only be had by sitting, as the trial judge, throughout the case.

The first prayer of the bill of complaint filed in this cause asked that the defendants, their police officers, detectives and agents working under them, be restrained and enjoined from interfering with the conduct of the lawful business of the plaintiffs. A careful study of the Snyder Act fails to disclose anything which would give relief from an unwarranted interference with the plaintiffs' business; there is nothing in that act to prevent the granting of equitable relief in such a cause; and in no forum but a court of equity could such relief be had.

Having acquired jurisdiction, the court could make a final determination of the whole subject. *Boni judicis est ampliare jurisdictionem.*

As was said in Miron *v.* Percheck et al., 279 Pa. 458, in a *per curiam* opinion: " 'It is quite true, as was held by the learned judge below, that equity having acquired jurisdiction of a case may decide all matters incidentally connected with it:' Graeff *v.* Felix, 200 Pa. 137."

Such a decree is within equity jurisdiction, avoids further litigation between the parties founded upon the facts developed, and is determinative of questions likely to arise between all parties connected with or interested in the dispute.

As pointed out in the opinion of July 31, 1929, the high-handed, arbitrary and unwarranted conduct of the Police Department savors of Bolshevick Russia. Mistaking a police uniform for the authority of law, the Police Department has attempted to destroy a business operating not only under a government permit but under the personal scrutiny of government agents.

Enforcement officers testified that their opinions were based upon rumors—mere gossip. The places they referred to as "cover-up" houses were well known to them but unmolested.

Much is made by defendants of the variance (according to their witnesses) between the samples filed in Washington and those taken in the seizures. Only by the most liberal interpretation of the rules of evidence could the samples be admitted, and the manner of proof was about as slipshod as the

method of keeping such samples. *Salus populi suprema lex* is a maxim apparently unknown to the defendants. Apparently, they still believe in the Divine right of kings and the *maxim Rex non potest peccare.*

No man can be judge in his own cause. *(Nemo debet esse judex in propria sua causa.)* But apparently the Director of Public Safety believes that by. the police power vested in him he may sweep aside law, equity and Federal permits and establish a jurisdiction of his own. But even the police power, undefined and unbridled, will not be permitted to work a wrong. *Omnia innovatio plus novitate perturbat quam utilitate prodest.*

The stenographic record is the only collection of facts before the court, and that which does not appear will not be presumed to exist. The law does not allow of a captious and strained intendment, for such nice pretence of certainty confounds true and legal certainty.

Nowhere does the record contain a statement that the lotions seized could be used for beverage purposes, and the law always regards the immediate, not the remote cause of any event.

No man should take advantage of his own wrong. Why should innocent persons be compelled by such high-handed practices to recover their lawful property by the long-drawn and tedious methods of a trial by jury in a Quarter Sessions Court?

*Acta exteriora indicant interiora secreta.* If the Police Department were confident that the plaintiffs were violating the law, they needed but to procure a search warrant and confiscate the contraband. But they preferred their highway confiscatory methods under the cloak of uniforms so as to better destroy their victims.

There is no right without a remedy, and equity looks upon that as done which ought to be done by both parties to every transaction.

For the reasons set forth in the opinion *nisi* and herein, I cannot agree with my colleagues, and in dissenting feel that defendants' exceptions should be dismissed.