DUNN *v.* THE STATE OF OHIO.

BUTTERWORTH *v.* THE STATE OF OHIO.

MEUSNER *v.* THE STATE OF OHIO.

WALKER *v.* THE STATE OF OHIO.

POSTON *v.* THE STATE OF OHIO.

(Decided March 24, 1930.)

*Messrs. Payer, Minshall, Karch & Kerr,* for plaintiffs in error.

*Mr. Ben Levin,* and *Mr. William S. Bundy,* for defendant in error.

VICKERY, P. J.   The first of these causes, Edward T. Dunn v. State of Ohio, comes into this court on a petition in error to the municipal court of the city of Cleveland and is heard in this court upon an agreed statement of facts.   The other cases which are mentioned in the caption of this opinion likewise came into this court on petitions in error to the municipal court of the city of Cleveland, except one, which came into this court on a petition in error to the municipal court of the city of East Cleveland, and, inasmuch as they all involve the same question, it is understood and agreed by counsel for the various plaintiffs in error, and the city of Cleveland and the city of East Cleveland, that they should all be heard and disposed of together.

In the first case, No. 10643, Edward T. Dunn v. State of Ohio, Dunn was arrested under an affidavit sworn out in the municipal court charging him with having violated Sections 6346-1 to 6346-11, inclusive, General Code of Ohio, and in the statement of facts upon which this action was tried in this court it is admitted that Dunn, at the time referred to and long prior thereto, had been engaged in the city of Cleveland, county of Cuyahoga, in the business of buying salaries of men employed in industries or on railroads, and it is admitted that the amount thus purchased by Dunn was less than three hundred dol-

lars and comes clearly within Section 6346-11, General Code. It is claimed, and this is the sole question that was heard in this court, that Section 6346-11, General Code, is void because it is in contravention of the Constitution of the United States and of the state of Ohio, and that a correct answer to this proposition solves the question at issue, and so we will address ourselves to this question: Is Section 6346-11, General Code, in contravention of the Constitution of Ohio and the Constitution of the United States?

Now Section 6346-11, General Code (113 Ohio Laws, 44), has just recently been enacted, and went into effect July 4, 1929, and its enaction was called for by the palpable evasion of the provisions of Section 6346-1 *et seq.*, General Code, which were passed to curb the rapacity of those who made loans on chattels and salaries. Those sections provided that such persons must get a license, and if they failed to get a license, then the highest interest that they could possibly charge, including charges, would be 8 per centum per annum; whereas, if they secured a license, they were enabled to charge 3 per centum a month, or 36 per centum per annum, and the men who are plaintiffs in error here have for a long period of time been evading that statute by seeking to withdraw themselves from under the statute by buying *outright,* as they claim, the salaries of men employed in industries and on railroads, and apparently they have been immune from punishment because the statute, Section 6346-1 *et seq.,* apparently did not cover the outright buying of salaries; and soon after the enactment of that statute its evasion was made possible by the unique scheme

of so-called buying outright of salaries, and two cases are invoked by the plaintiffs in error as to why this court has no power other than to declare this statute unconstitutional.

The one is the case of *State* v. *Mehaffey*, 112 Ohio St., 330, 147 N. E., 506, 508, which went up from this county, and the judgment of this court was affirmed by the Supreme Court, in which case the court used this language:

"If the practices of the defendant and others similarly engaged require the supervision of the commissioner of securities, that is a subject for the consideration of the legislative branch of this state, and not for the courts."

Now it must be remembered that the *Mehaffey case* was decided before the Legislature passed Section 6346-11, General Code, and apparently that section was passed to meet the very objection that was raised in the *Mehaffey case, supra.* Then it now devolves upon this court to answer the query of the Supreme Court: Has the evil grown to such proportions that it is necessary for the state to supervise, in the interests of public justice and square dealing, the buying of salaries outright? Has the evil risen to such proportions in the state that it becomes a public duty to protect certain necessitous people from the rapacity of those who would enrich themselves upon the misfortunes of others?

It is argued in this case that Section 6346-11 is unconstitutional, because it prevents the freedom of contract. At the first hearing of this case it was argued with much vehemence by the able and learned counsel for the plaintiffs in error that the enforcement of this section would prevent *any* person from

buying the salary of another, and would thus prevent any person from selling his salary to another, because the one who bought it would subject himself to the penalties prescribed in the statute. On the second hearing, however, this argument was practically abandoned, because this statute does not prevent the individual from selling a salary, nor an individual from buying it. It is aimed only at those who are in the *business* of buying salaries. It is argued furthermore that *the courts* have the power to prevent the wrong by deciding against the person who buys a salary at an extravagant rate of interest.

It may be granted that courts of equity always have had—and I hope always will have—the power to grant relief against catching bargains, or to relieve the necessitous against the greed of those who wish to wax rich upon their misfortunes. This court has had some experience in this line. Among cases that have come before this court is one in which one of these various defendants was defendant, where a man had borrowed in an hour of dire distress and need the sum of $45 and had given an assignment of his salary which became due in two weeks. At the end of the two weeks he drew his salary and took it to the salary broker, and inasmuch as he did not have outside of his salary the money to pay it back, he paid the interest, which was $4.50 for two weeks, and he kept that up until he had paid back $210, and he then still owed the *buyer* of this salary the original sum of $45. In other words, this buyer of this salary was exacting 240 per cent. per year for the use of his money.

This case was brought into our court by the man who could stand the rapacity of the buyer of the

salary no longer, and he invoked the aid of the Legal Aid Society, and it came into court for the purpose of recovering back the money that had been paid to the salary buyer and canceling the assignment of the salary that was still outstanding. We heard that case, and the very able counsel in that case, being the same counsel as in the instant case, apparently rather than have the court write an opinion, conceded all that the plaintiff asked and paid him back every dollar and surrendered the outstanding obligation held against him. *Steiger* v. *Central Finance Co., Inc.,* unreported.

Now admitting that a court of equity has the power to grant relief, yet the poor fellow who was in the clutches of the rapacious buyer of the salary could not get enough money to pay his loan, much less hire lawyers to go into court and contest in a litigated suit his right to recover what he has been compelled to pay. Think for a moment of the plight of a man whose child is ill, and he has spent the last dollar of his salary. Assume that he draws $200 per month, $100 every two weeks. His child is ill and he has used every cent of his salary to buy medicines and to care for his baby, and the baby dies. He must have money to give it a decent burial. His money is gone. His unearned salary is the only thing he has got. He goes to one of these buyers of salary and pays $10, and he assigns his $100 salary, which is to be paid back in two weeks. He gets $90. He gives an obligation for $110. In two weeks he is in no better condition than he was before. He can only go to his employer and draw his salary and take it up to the buyer of his salary and pay another $10, and so go on ad infinitum until he pays 240 per

176

cent. a year and still owes the original amount he borrowed. This is no fanciful dream. It is a reality, and it is a reality that has come under our own observation, and it apparently existed all over the state of Ohio until it reached the ears of the Legislature; and the Legislature, in order to curb the rapacity of those who would fatten themselves upon the misfortunes of others, passed Section 6346-11, above referred to. And these men say that the law is unconstitutional because it interferes with their right to contract. Is it unconstitutional to pass a law against thievery, against those who enter the second story in the nighttime and rob one of his money? Is it any more despicable to do such a thing than it is to fatten on the misery and poverty of those who are in want, whose necessities are taken advantage of, and who are forced by these very necessities to pay the exorbitant rate of interest? "Man's inhumanity to man makes countless thousands mourn," and it is that spirit that prevailed over the state among a certain class of persons who were not content to get 36 per cent. per year but wanted 240 per cent. They are not content to bring themselves within the provisions of Section 6346-1 *et seq.*, but set themselves aside and align themselves under the 240 per cent. class.

Now it must be remembered that this statute does not prevent me, or any person, from going to any bank or any concern and selling a salary for what we are willing to take for it. If it did, then it would be an interference with the right to contract; but it is not that. I can sell my salary for $30 if I wish, and the man who buys it will not violate this statute if he is not engaged in the *business* of buying sal-

aries. It must be manifest to any person who has given this a moment's thought that this so-called buying of salaries is simply a subterfuge to evade the burdens of the statute. If this salary was bought outright, and it was a closed transaction, and the purchaser presented this claim to the employer and drew it, the transaction thus being ended, that might be a different matter; but no, these purchasers have bought something, and they authorize and permit the man that sold it to them to draw it and to bring it to them. Under what penalty? Under the penalty that he probably will lose his job, because the railroad companies and the industrial authorities do not want to be bothered with attachments and other things, and they fire their employees; and it is an unhappy fact that employers of labor will permit their laborers to be gouged in that sort of a way.

But such a buying of salaries is nothing more than a subterfuge invented by the adroit minds of those whose purpose is to evade the burdens imposed by the chattel loan law in Section 6346-1 *et seq.* of the General Code, and in the *Mehaffey case* the learned judge of the Supreme Court held that it was a legislative matter and not a judicial matter; that courts could only administer the laws and construe them; and that where the Legislature had not covered the case, either through oversight, or otherwise, it was not for the courts, but for the Legislature, to cure. Apparently acting upon that suggestion, the Legislature did enact the present statute, Section 6346-11 (113 Ohio Laws, 44).

Now is that section unconstitutional? Did not the Legislature under the broad police power of the state have the right, nay, was it not its duty, to pass

the statute to curb those who evaded or sought to evade by a mere subterfuge the plain import of the law—a statute to the effect that those who were loaning money on chattels or salaries, or otherwise, should, if they wanted to draw more than 8 per cent. interest, procure a license, and in that event they could draw 36 per cent. a year, or 3 per cent. a month? Isn't that enough to gratify the rapacity of the most rapacious of men in dealing with their brothers in human affairs? It would seem so, but not to that class of men who invoke the Constitution to protect them in their nefarious designs of collecting 240 per cent.

Now it must be remembered that the Legislature of Ohio is supreme in its domain, and it can pass any law that the English Parliament could pass, unless it be restricted by the Constitution of Ohio or the Constitution of the United States. When a matter is brought under the police power, the power which enables the Legislature to pass laws for the protection of the inhabitants against certain wrongs, Constitutions do not have much sway. It was a witty man who once said—a witty Irishman, I believe— that the police power was that power residing in the courts and the Legislature which would permit them to pass or uphold a law, which but for the passing or upholding would be unconstitutional; and so when a law comes within the police power both the Legislature and the courts have a large latitude, and when one looks to the authorities upon the construction of statutes, such as Dwarris on Statutes, and the decisions of courts upon the reconciliation of statutes with the Constitution, one runs up against this proposition: That the courts never

should invade the province of the Legislature and declare a law unconstitutional unless it be clearly and manifestly so; that if by any sort of construction, short of being fantastic, courts can construe the law to be valid, or in accord with the Constitution, it is the duty of the court so to do. In other words, it is the legislative duty to pass laws, and it is the court's duty to follow those laws and to construe them in accordance with the Constitution, unless they are manifestly and clearly in violation thereof.

Applying that doctrine to the instant case, to Section 6346-11 of the General Code, can there be any doubt but that this section comes within the provisions of this chapter? It must be remembered that Section 6346-1 and succeeding sections, all save Section 6346-11, which went into effect July 4, 1929, have been construed and upheld as proper functions for the legislative body to exercise. Section 6346-11 only provides that as to those who are engaged in the business of buying salaries, where the amount involved is less than $300, such transaction, for the purpose of the chapter, shall be deemed to be a loan so as to clear up any ambiguity which lies in Section 6346-1, General Code, which is as follows:

"It shall be unlawful for any person, firm, partnership, association or corporation, to engage, or continue, in the business of making loans, on plain, endorsed, or guaranteed notes, or due-bills, or otherwise, or upon the mortgage or pledge of chattels or personal property of any kind, or of purchasing or making loans on salaries or wage earnings, or of furnishing guarantee or security in connection with any loan or purchase, as aforesaid, at a charge or

rate of interest in excess of eight per centum per annum, including all charges, without first having obtained a license so to do from the commissioner of securities and otherwise complying with the provisions of this chapter.''

Now when it is admitted that this section has been construed by the Supreme Court, and has been sustained as being within the proper power of the Legislature to pass, it must follow as the night the day that the Legislature can go a step farther and correct what it must have seen was an oversight, in that it apparently permitted under the guise of a sale the defeat of the very end and aim of this law, and so the Legislature in passing Section 6346-11 said that such transaction shall be deemed to be a loan and thus come within the provisions of this chapter.

It is argued that that interferes with the powers of the court; that the Legislature has usurped the functions of the court in saying that what purports to be upon its face a sale is in fact a loan. It is argued, and ably argued, too, that that is the function of the court; that if the court, after hearing the evidence, should so decide that to be a loan, it would have the power to do so; but the trouble with that argument is that the poor fellow who has been compelled to sell his salary can ill afford to go into a court and hire lawyers who could meet the distinguished ability of the men who are employed by those who seek to enrich themselves on the misfortunes of their brothers—I say they could ill afford to come into court, and when they would get there the court, of course, would do as this court

would have done in the *Steiger case,* above referred to.

But that is not a remedy that will cure the evil. The Legislature having the power to cure this evil, having thought that it had cured it by the passage of the original additions to Section 6346 of the General Code, when they found that there was a loophole, sought to remove that loophole by passing Section 6346-11, and we think they have done so. We at least do not think there is any unconstitutionality in this law.

We have been referred to the case of *Tyson & Bro.* v. *Banton,* 273 U. S., 418, 47 S. Ct., 426, 71 L. Ed., 718, 58 A. L. R., 1236, as being a case in point, and it is argued with much force that the Supreme Court of the United States refused to uphold a law of New York under circumstances almost exactly similar to the instant case. Now is that so? Tyson & Brother were dealers in theater tickets. They would buy them up and then would sell them at an immense profit to those who wanted to attend the theater, and a law was passed by the Legislature of New York to curb such practices; and the case got into the Supreme Court of the United States, and five out of the nine judges of the Supreme Court of the United States held that the matter was not of enough public importance to authorize the Legislature to interfere; that, at best, the people could go to the theater or stay away, and if they wanted to buy a theater ticket and pay a big profit therefor to the brokers in theater tickets it was their own business; and that the practice had not reached such proportions as would justify the Legislature to in-

tervene. Now this was the opinion of the majority of that court.

I need not point out how unlike, how far from being like, that case the instant case is. Here we are dealing with the very necessities of life. Here we are dealing with the salaries of men who must support their families, and take care of the ailing and sick out of their salaries, and they are not dealing at arm's length in the instant case. But in the *Tyson case* they are catering to the pleasures of the people. People can go to theaters or not, and if they do not want to pay exorbitant prices for tickets they need not go, and in nine cases out of every ten they will not lose much if they do not go; it is nothing but a gratification of the senses, and a pleasure, at best, and therefore that case is not parallel with the instant case. But, mark you, out of the learned gentlemen that constituted the Supreme Court of the United States, four of the nine judges, and among those four were men like Justice Holmes, men like Justice Brandeis, and other men who are more in accord with the advanced thought of the day than were the majority of the court, dissented. Justice Holmes stands out in his ninetieth year as a monument to progressive thought and as an exponent of the emancipation of the court from the traditions which have made it hidebound for so many years, and Justice Brandeis, who coincided, is an able compeer. I only speak of this because the *Tyson case* is so far foreign to this case that there cannot be any comparison, and yet four of the nine judges thought that even in the matter of the buying and selling of theater tickets at an advanced price it was within the province of the Legislature of New York to

pass laws to curb the rapacity of those who would wax rich upon a pleasure-going public that attended the theaters.

There can be no question that the *Mehaffey case, supra,* is an authority upon which the structure of Section 6346-11 in question was in part built. There can be no question of the necessity of passing such a law. There can be no question that it does not interfere with the right to contract. There can be no question that it does not come under either the section of the state Constitution or the section of the United States Constitution invoked by these men who are plaintiffs in error in this action. There can be no question that the other case which they rely on, the *Tyson case,* is no parallel case whatever; but even if it were, the authority of the dissenting judges to that action would weaken it so that it would be of no importance at all—a five to four decision upon a question so unlike the instant case that it is not parallel at all. And if this case were before the Supreme Court of the United States—and I sincerely hope that it will get there—I can imagine the whole court of nine of the judges uniting and sustaining the constitutionality of the provision in question.

Now when one remembers that courts are loath to interfere with the powers of the Legislature and that a court's duty is to construe and not to make or unmake laws; when one remembers that in spite of all the talk the Supreme Court of the United States has in less than one hundred cases in its history declared a law of Congress to be unconstitutional, recognizing in this that the legislative branch of the government is supreme in its sphere, for it

is only when the law manifestly violates the letter
and spirit of the Constitution that the court will de-
clare it to be invalid; when one remembers all these
things and then remembers the necessity and the
purpose for which Section 6346-11 was passed, that
is to meet the way in which the astute lawyers, and
perhaps more astute men who engage in buying
salaries, had found to evade the provision of Sec-
tion 6346-1, General Code, making it necessary for
the Legislature to pass Section 6346-11, General
Code, one must always bear in mind that this does
not strike at individual contracts, nor individual
contractors, but strikes only at those who are doing
a business of buying salaries, for it only provides
that in such case the so-called buying shall be deemed
to be what it actually is, a *loaning* of money upon a
salary; and the purpose was to curb the taking of
240 per cent. per year from the man whose very nec-
essities of life and death compelled him to go to one
of these persons who buy salaries to get the money
to carry him over the pressing trouble. And when
he once gets in he finds it impossible to extricate
himself, and ultimately after he has paid many,
many times his loan, and still owes it, he perhaps
goes to the Legal Aid Society, which takes the case
into court, and, of course, he wins the case because
the court sees that that was nothing more than a
loan under the guise of buying salaries, in which
event he can be charged only the legal rate of
interest, 6 per cent., and no more. And all the Legis-
lature did was to say that those who are engaged in
the buying of salaries shall be deemed, if the sum
is less than $300, to be engaged in the loaning of
money upon salaries, and thus come within the pro-

visions of this chapter and are amenable to its provisions; and instead of the poor fellow having to work his own way out he can go to the authorities and have the man arrested and fined. If these persons want to carry on their business, they can get a license from the State Securities Department, and then they can get 36 per cent. a year, and isn't that enough? Is there any reason why the court should go out of its way and declare this law unconstitutional? Is there any reason why this court should usurp the functions of the Legislature when it has so plainly sought to do its duty with respect to its citizens? We think not. We think this law is constitutional. We think it was within the province of the Legislature to pass it, and that being the only question that has been urged before us we come to the conclusion that the court below was right in upholding the law. There being no error, the judgment will be affirmed.

*Judgment affirmed.*

SULLIVAN and LEVINE, JJ., concur.